[Civ. No. 27348. Second Dist., Div. Four. Apr. 23, 1965.]

ALBERT LeMERE, Plaintiff and Appellant, v. MORRIS L. GOREN, M.D., Defendant and Respondent.

800

Belli, Strong, Ashe & Gerry and William Strong for Plaintiff and Appellant.

Hugh B. Rotchford, Lowell T. Anderson, Richard T. Drukker and Chase, Rotchford, Downen & Drukker for Defendant and Respondent.

JEFFERSON, J.—Plaintiff appeals from a judgment entered upon a jury verdict in favor of defendant in an action to recover damages for alleged malpractice in administering a hypodermic injection.

The principal contention urged is that the trial court committed reversible error in refusing to give plaintiff's proffered instructions on res ipsa loquitur.

Plaintiff was injured in an automobile accident in the latter part of 1957. After the accident plaintiff became a patient of defendant, an orthopedic surgeon. Defendant treated plaintiff for recurring ill effects, resulting from the accident, to the cervical and shoulder areas of plaintiff. In spite of intensive medical care, plaintiff apparently did not respond satisfactorily to the medical treatment. On February 9, 1959, plaintiff came to defendant's office and complained to defendant of pains at the base of his neck with associated headaches. He, however, had no difficulties with his right arm or hand.

Defendant, determining that plaintiff should have an injection of novocain to relieve this condition, inserted an injection needle into plaintiff's neck in the area at the base of his neck and right shoulder blade. According to plaintiff's testimony, defendant gave him the injection over plaintiff's strenuous objections that he did not want "any shots." When the needle was injected, his right arm shot up involuntarily, felt like it was filled with electricity, and he screamed with

pain. He begged defendant to stop the injection. Defendant withdrew the needle, but then reinserted it. His arm again rose in the air and he felt the same painful shock sensation. Against his protests, defendant, after partially withdrawing the needle, injected it a third time, with the same results. According to plaintiff, his right arm, hand and side became paralyzed. Thereafter, while still paralyzed, he was taken home with the assistance of his wife and son.

Defendant testified that plaintiff complained bitterly of pain when the needle pierced his skin. Without withdrawing the needle, defendant released a small amount of novocain to anesthetize the skin, and then proceeded in for about a quarter of an inch and released more novocain. When plaintiff complained violently of pain and screamed his right arm and leg were paralyzed, defendant withdrew the needle. Defendant reassured plaintiff that he was not paralyzed by showing him that he could move his arm and hand and that he could walk. After a short resting period plaintiff left defendant's office. Defendant denied that he gave plaintiff three separate injections or that plaintiff's arm flew up in the air at any time during the injection.

Defendant made a written report of the examination and treatment he had given plaintiff on February 9, for plaintiff's general physician (Plaintiff's Exhibit 5). The only reference in the report to the novocain injection was in the concluding paragraph which stated as follows: "At the present time, he [plaintiff] was given 5cc novocain injection into the tender area of the right midcervical region, with some excellent results as far as pain sensation was concerned. However, he is quite apprehensive and became upset during the injection."

Bearing upon the nature, cause and extent of plaintiff's injuries, was the following testimony:

Plaintiff testified that since the injection he has had continuous excruciating pain in his right arm and hand which has become progressively worse and has rendered his right arm and hand useless. Prior to the injections of February 9 he had no pain in his right arm or hand and was able to use his hand in a normal manner.

Dr. Huddleston testified that he had observed the condition of plaintiff's right arm and hand both before and on the day after defendant's injections of February 9. Prior to February 9, plaintiff made no complaint about pain in his arm or hand. He was treating plaintiff for pains in his neck and back resulting from a 1957 auto accident. On February 10 plaintiff

came to him and complained of severe pain in his right upper extremity, extending from his shoulder down to his hand. He was not able to use his hand. Dr. Huddleston noted the various symptoms in plaintiff accompanying the onset of causalgia, a continuous state of pain, usually in an extremity, and that causalgia could be caused by a traumatic injury to nerves in the brachial plexus area.

Dr. Berryman, who specializes in neurology, saw plaintiff on April 6, 1959. He found about 90 per cent ''paralysis of the muscles of the right forearm and hand'' accompanied by ''a great deal of pain.'' In attempting to ascertain what defendant had done to plaintiff on February 9, he spoke to defendant on the telephone. Defendant told him that during the injection plaintiff experienced pain and ''leaped up off the table,'' whereupon defendant withdrew the needle. (Defendant in his testimony denied he said this to Dr. Berryman, claiming that he said plaintiff threw himself around the table.) From his examination of defendant, Dr. Berryman concluded: ''From the facts I know of this case, the neurological findings and the electromyographic findings, I feel that no doubt this man [plaintiff] has a brachial plexus lesion involving a portion of the lower fibers of the brachial plexus''; that ''the more likely factor'' in causing the injury to plaintiff's brachial plexus was ''the actual physical trauma of the needle.'' When asked by the court whether this type of injury generally does not happen in the absence of negligence, the doctor replied ''I don't think any negligence is present here at all. . . .''

Dr. Rabin, the chief medical witness for the plaintiff, testified that it was contrary to the standards among doctors in good standing in the community to inject novocain, for the purpose of relieving pain and muscle spasm, into any nerve; that an injury to a nerve as a result of an injection was not acceptable under such standards; that the facts here showed that the injection or injections of February 9, 1959, tore and lacerated nerve fibers in plaintiff's brachial plexus. Dr. Rabin further testified that when, in connection with an injection near a nerve structure going into an arm, the patient throws up his arm and screams with pain, this is an indication that the needle hit a major nerve structure; that the proper procedure where this occurs while an injection is being made near the brachial plexus region, is to immediately withdraw the needle; that it is contrary to the standards to go back in again with the needle or to continue the injection under such

circumstances, and that it is contrary to the standards to advise the patient, under the circumstances here shown, that nothing is wrong with him, and that it will go away. In further testimony, Dr. Rabin stated that defendant's written report of the February 9 treatment gave the impression that nothing untoward had happened, that defendant had in fact benefited plaintiff. Under the applicable medical standards it would be mandatory for the physician writing such a report to tell exactly what happened and not to omit various vital factual matters; that the "facts" in the February 9 report presented a wrongful "concealment" by defendant which had the effect of lulling the patient or a succeeding doctor into a sense of security.

Dr. Bailey testified by deposition that improper insertion of an injection needle is dangerous, and that puncturing a nerve could cause causalgia; this is not the proper method of injecting a nerve with novocain; the proper way of injecting the brachial plexus area requires avoiding penetration of the nerves, with the needle merely being introduced into the space over the brachial plexus; if a nerve is hit by the needle, the patient complains and jumps or screams; upon such an occurrence "you just draw away" and don't go back in again. Although he had never personally read or in his own experience met with a causalgia produced by the "puncture" of a nerve with a needle, Dr. Bailey stated, "you can pass the point of a needle through a nerve and jiggle it, wriggle around in such a way that you can tear some of the fibres within the nerve, and then you might wind up with a causalgia." Dr. Bailey further testified that plaintiff had been under his care about a year prior to the injection by defendant, for injuries he suffered in the 1957 automobile accident. He had given plaintiff at least two injections for the purpose of anesthetizing the nerves in the area around each of plaintiff's shoulder blades. Plaintiff's reaction to these injections was quite violent, and, in his opinion, was not physically justified.

Defendant, in his testimony, acknowledged that, prior to the February 9 injection, plaintiff had nothing wrong with his right arm or hand. He was treating plaintiff's neck pains, not his arm or hand. In inserting the needle, he was not aiming for the brachial plexus, but at the "deeper structures in his sympathetic chain." Defendant admitted that the nerves of the brachial plexus were in the area in which he was injecting. He stated, however, that the point of his needle was ½ to 1 inch from the brachial plexus. Defendant further testified

that, although he did not find causalgia in plaintiff's arm on February 9, he did find it when plaintiff returned to his office on March 23.

Dr. Abbott, a neurosurgeon, testified that he did not think it was possible that plaintiff's causalgia was caused by the injection of a needle with novocain into the segments of the brachial plexus. He had performed in the region of 2,000 stellate ganglion blocks and 200 brachial plexus blocks and put the needle ''into the nerve itself,'' which is standard procedure, and has never seen causalgia develop. He did not believe a nerve could be severed by a needle. Defendant, in his opinion, was not negligent in attempting and performing the injection of February 9.

Dr. Crowe, an orthopedic specialist, had never seen causalgia result from a piercing of the brachial plexus with novocain and with the size needle defendant used. He was of the opinion that defendant was attempting a commonly accepted procedure for the treatment of plaintiff's symptoms and that there was no lack of skill and diligence in undertaking the injection.

Dr. Denson, an anesthetist, had had experience with four or five thousand brachial plexus blocks and had never heard of causalgia being a complication of an injection of novocain into this area. In his opinion medical doctors do not know what causes causalgia or what kind of disturbance to the sympathetic nervous system will result in causalgia.

At the outset, we find no merit in plaintiff's contention that the evidence was insufficient to sustain a verdict for defendant. Substantial evidence was presented, in the form of testimony of Drs. Crowe, Abbott and Denson, to support the findings made. It is well established that the appellate function is exhausted when it is ascertained there is a conflict of substantial evidence upon the controlling issue or issues. (*Florez* v. *Groom Development Co.*, 53 Cal.2d 347, 354 [1 Cal. Rptr. 840, 348 P.2d 200].) Nor do we find meritorious the assertion by plaintiff that the cross-examination, by defense counsel, of plaintiff's chief medical expert, Dr. Rabin, exceeded the bounds of permissible cross-examination. The questions objected to related primarily to the qualifications of the witness to testify as an expert and, as such, were entirely proper. As the court said in *Hope* v. *Arrowhead & Puritas Waters, Inc.*, 174 Cal.App.2d 222, 230 [344 P.2d 428], ''Once an expert offers his opinion, . . . he exposes himself to the kind of inquiry which ordinarily would have no place in the cross-

examination of a factual witness. The expert invites investigation into the extent of his knowledge, the reasons for his opinion including facts and other matters upon which it is based (Code Civ. Proc., § 1872), and which he took into consideration; and he may be 'subjected to the most rigid cross-examination' concerning his qualifications, and his opinion and its sources [citation].''

Plaintiff contends that the trial court erred in questioning Dr. Berryman concerning his opinion as to whether defendant was negligent. Prior to the court's examination of the witness, Dr. Berryman had testified that he had examined and performed various tests on plaintiff's arm and hand beginning on April 6, 1959; he contacted defendant to get his version of what had occurred; he then wrote a comprehensive report of his findings. After testifying, that ''the more likely factor'' in causing the injury to plaintiff was the actual physical trauma caused by the injection needle administered by defendant on February 9, the court asked the witness: ''Assuming that that was the cause, is this the type of injury which ordinarily does not occur in the absence of negligence in administering the particular injection?'' Dr. Berryman replied that in his opinion there was no negligence present. A motion by plaintiff to strike the doctor's answer on the ground that no proper foundation had been laid, was denied.

Plaintiff maintains that the witness did not have sufficient information upon which to base such an opinion, and that it invaded the province of the jury.

As to the latter point a number of cases purport to state a general rule excluding opinion evidence on ultimate issues, on the ground that such issues are questions solely for the jury. (See *Norden* v. *Hartman*, 134 Cal.App.2d 333, 337 [285 P.2d 977], and *Thomason* v. *Hethcock*, 7 Cal.App.2d 634, 637 [46 P.2d 832], both holding it was improper to ask a doctor whether the defendant had exercised due care. Also see *Sim* v. *Weeks*, 7 Cal.App.2d 28, 38 [45 P.2d 350].) The more recent cases, however, have rejected a rule which renders an expert opinion objectionable merely because it embraces an ultimate issue. '' [I]n this state we have followed the modern tendency and have refused to hold that expert opinion is inadmissible merely because it coincides with an ultimate issue of fact.'' (*People* v. *Cole*, 47 Cal.2d 99, 105 [301 P.2d 854, 56 A.L.R.2d 1435].) As stated in *Wells Truckways, Ltd.* v. *Cebrian*, 122 Cal.App.2d 666, 678 [265 P.2d 557], '' 'It is certainly contrary to the unmistakable trend of authority to exclude expert

opinion testimony merely upon the ground that it amounts to an opinion upon ultimate facts. The modern tendency is to make no distinction between evidential and ultimate facts subject to expert opinion. The courts consider that it is more important to get to the truth of the matter than to quibble over distinctions in this regard which are in many cases impracticable.' '' (See also *Magee* v. *Wyeth Laboratories, Inc.,* 214 Cal.App.2d 340, 357 [29 Cal.Rptr. 322].)

It is clear that an expert witness may give his opinion where he has knowledge of the actual facts derived from his own observations. (Witkin, Cal. Evidence (1958) § 620, p. 669.) The record indicates that Dr. Berryman had sufficient information about the facts to form the basis of an opinion. The record also shows the facts which Dr. Berryman assumed to be true as a basis for his opinion. In weighing the value of his opinion, the jury could consider whether the facts were as Dr. Berryman believed them to be. Under the circumstances it was not error for the court to refuse to strike the answer upon the ground stated.

A more critical problem is raised by the refusal of the trial court to give to the jury the following instructions, requested by plaintiff:

''You must decide the following questions concerning the injury involved in this case.

''Is it the kind of injury which ordinarily does not occur in the absence of negligence?

''Whether the injury is one which ordinarily does not occur in the absence of negligence is to be determined from the evidence presented in this trial by physicians and surgeons called as expert witnesses.

''Was the injury caused while the plaintiff was exclusively under the care or control of the defendant(s)? The plaintiff is not required to identify the particular agency or instrumentality which caused the injury if he is unable to do so because of his physical condition at the time the needle treatment, on February 9, 1959, was (administered) (performed).

''Was the injury due to any voluntary action or contribution on the part of the plaintiff?

''The mere fact that a particular injury does not ordinarily result from such treatment does not, in and of itself, prove that it was caused by negligence.

''If, and only if, you find that the plaintiff's injury was of a kind which ordinarily does not occur in the absence of negligence, was caused while the plaintiff was exclusively un-

der the care of [*sic*] control of defendant(s), and was not due to any voluntary action or contribution by the plaintiff, you are instructed as follows:

"⁣. . . . . . . . . . . . . . .

"From the happening of the accident involved in this case, an inference arises that a proximate cause of the occurrence was some negligent conduct on the part of the defendant. That inference is a form of evidence and unless there is contrary evidence sufficient to meet or balance it, the jury should find in accordance with the inference.

"When there is any evidence to the contrary, you must weigh all of the evidence bearing upon the issue of defendant's negligence. If the evidence tending to prove that the accident was caused by a failure of the defendant to exercise the care required of him has greater weight than the evidence to the contrary, you will find in favor of the plaintiff on that issue.

"In order to meet or balance the inference of negligence, the defendant must present evidence to show either (1) a satisfactory explanation of the accident, that is, a definite cause for the accident, in which there is no negligence on the part of the defendant, or (2) such care on the defendant's part as leads to the conclusion that the accident did not happen because of want of care by him, but was due to some other cause, although the exact cause may be unknown. If such evidence has at least as much convincing force as the inference and other evidence, if any, supporting the inference, then you will find against the plaintiff on that issue."[1]

Two of the authorities relied upon by plaintiff seem inapplicable here. They are *Wolfsmith* v. *Marsh*, 51 Cal.2d 832, 835 [337 P.2d 70, 82 A.L.R.2d 1257], and *Bauer* v. *Otis*, 133 Cal.App.2d 439, 444 [284 P.2d 133]. Both of those decisions rest in part upon an assumption that it is a matter of common knowledge among laymen that injections do not ordinarily cause trouble unless unskillfully done or there is something wrong with the serum. █ In the present case there is medical testimony that a novocain injection into the brachial plexus area, properly done, may by chance result in injury to the nerve. With respect to this particular type of injection, common knowledge of laymen is not a reliable foundation.

However, we believe a reversal of the judgment is required by the reasoning of the Supreme Court's opinions in *Seneris* v.

---

[1] California Jury Instructions, Civil (4th rev. ed. 1964 pocket part) Nos. 214-W and 206 (Revised).

*Haas,* 45 Cal.2d 811 [291 P.2d 915, 53 A.L.R.2d 124] ; *Davis* v. *Memorial Hospital,* 58 Cal.2d 815 [26 Cal.Rptr. 633, 376 P.2d 561] ; and *Quintal* v. *Laurel Grove Hospital,* 62 Cal.2d 154 [41 Cal.Rptr. 577, 397 P.2d 161]. █ In the *Davis* case the court said (at p. 817) :

"Res ipsa loquitur applies where the occurrence of the injury is of such a nature that it can be said, in the light of past experience, that it probably was the result of negligence by someone and that the defendant is probably the person who is responsible. In determining whether such probabilities exist with regard to a particular occurrence, the courts have relied both on common knowledge and on expert testimony. [Citations.] █ Where the evidence is conflicting or subject to different inferences as to a fact necessary to the applicability of the doctrine, for example, as to whether an accident claimed by the plaintiff happened or whether an injury was caused by the conduct of the defendant rather than by the acts of someone else, the question of fact must be left to the jury under proper instructions. [Citations.]"

█ In the present case the record includes the following evidence :

Plaintiff testified that when the needle was inserted he yelled with pain and begged the defendant to stop. Defendant partially withdrew the needle, and then plunged it in twice again.

Dr. Rabin testified that it is contrary to accepted medical standards to use as large a needle as defendant used for this procedure, that in making such an injection the proper practice is to avoid the nerve, that the patient's reaction indicated that the needle had struck a major nerve structure, and that to reinsert the needle after the patient reacted in pain "would be compounding the negligence." It was Dr. Rabin's opinion that the needle lacerated the nerve fibers, and this produced the causalgia from which plaintiff is suffering.

Dr. Berryman expressed the opinion that plaintiff's condition was the result of the destruction of the sympathetic nerve fibers, caused by the physical trauma of the needle.

Dr. Huddleston also was of the opinion that causalgia may be caused by traumatic injury to the nerves in the brachial plexus area.

Dr. Bailey agreed that puncturing a nerve could cause causalgia, though he also testified that injury to some nerves is a calculated risk in doing a brachial plexus block.

Dr. Abbott and Dr. Crowe, testifying for the defense, said

that causalgia is a very rare occurrence, and that they had never heard of a case in which it had resulted from an injection of novocain in the brachial plexus.

This of course is not all the evidence on the subject. Dr. Rabin's qualifications in this area of medicine were challenged in cross-examination and his opinions were contradicted by other medical witnesses. None of the medical witnesses stated that this is a type of injury which ordinarily does not occur in the absence of negligence, but the jury could have drawn that inference if it believed particular portions of the testimony which was presented. Dr. Rabin actually went further when he said that in his opinion, "this injury, I don't think, could have been produced unless the shot was not in keeping with accepted standards . . . ."

The recent decision in *Surabian* v. *Lorenz*, 229 Cal.App.2d 462, 467 [40 Cal.Rptr. 410], cited by defendant, is readily distinguished. That opinion points out that all the medical experts testified that an undesirable reaction similar to that suffered by the plaintiff there was an inherent risk of the kind of injection which had been administered to her. There was no conflicting evidence as to the procedure followed by the defendant dentist, and no evidence that the procedure departed from the best practice. Plaintiff sought unsuccessfully to rely upon "common knowledge" that injections do not ordinarily cause bad reactions, but the expert testimony dispelled the asserted "common knowledge."

Plaintiff here relies upon inferences drawn from the testimony of medical experts. It is true that if the jury had believed the evidence upon which plaintiff relies, it would have found in favor of the plaintiff under the general instructions given by the court upon the subject of negligence, medical malpractice, proximate cause, indirect evidence and inferences. The same could be said for the facts in the *Davis* case, *supra* (which the Supreme Court reversed for failure to give the same kind of "res ipsa" instruction that was refused in the instant case), and the *Quintal* case, *supra,* where the majority opinion, in discussing the sufficiency of the evidence, said (at p. 164):

"Here we have an injury which is very rare. It is an injury that could result from negligence, or could result without negligence. Is it more probable than not that it was the result of negligence? That is the question. The plaintiffs, out of the mouths of defendants and their witnesses, proved that the injury could occur as a result of negligence. There is also

evidence that the injury could occur without negligence. In such circumstances the jury should be instructed that if they find certain facts to be true they should apply the inference involved in res ipsa.''

The quoted language (which was written after this case was tried) applies literally to the facts of this case, excepting only that the evidence that the injury could occur as a result of negligence came from witnesses called by plaintiff. Even though the applicability of res ipsa loquitur in this kind of case depends upon a preliminary finding which would support a verdict for plaintiff under the instructions which were given, the authorities require that the ''conditional res ipsa'' instruction be given; and that upon failure to give it a judgment for defendant must be reversed.

The judgment is reversed.

Files, P. J., and Kingsley, J., concurred.

A petition for a rehearing was denied May 18, 1965, and respondent's petition for a hearing by the Supreme Court was denied June 16, 1965. Traynor, C. J., was of the opinion that the petition should be granted.