[Civ. No. 29011.   Second Dist., Div. Four.   Oct. 18, 1966.]

EURETTA M. CAMPOS, Plaintiff and Appellant, v. WIL-
LIAM F. WEEKS, Defendant and Respondent.

Caryl Warner for Plaintiff and Appellant.

Bonne & Jones and H. Gilbert Jones for Defendant and Respondent.

JEFFERSON, J.—Plaintiff instituted a malpractice action against defendant doctor after she suffered an anaphylactic reaction to a hypodermic injection given to her by defendant. A jury trial resulted in a verdict in favor of defendant. From the judgment subsequently entered plaintiff appeals.

The trial court refused to give instructions requested by plaintiff on the doctrine of res ipsa loquitur. The single issue raised here is whether this was error.

The facts—as presented in a settled narrative statement under rule 7(a), California Rules of Court—are as follows:

Defendant testified (after being called to the stand by plaintiff pursuant to Code Civ. Proc., § 2055) that he is a practicing physician and surgeon. On January 3, 1961, plaintiff (a 65-year-old woman) came to his office and consulted with him in regard to a puncture-type cut on her left index finger. Defendant discussed with plaintiff the possibility of giving her tetanus antitoxin. Plaintiff stated she was afraid of taking a tetanus shot because her father nearly died after taking one. In response to defendant's query as to whether plaintiff had any allergies to other medications, defendant replied that she had had penicillin without any reaction. Defendant advised an injection of penicillin as a preventative for tetanus and local infection of the finger. Plaintiff assented and defendant administered 300,000 units of penicillin into

the deltoid region of her left arm, a proper dosage for a 65-year-old woman under the circumstances. Defendant was aware at the time of the possibility of an anaphylactic reaction, which is a known risk of an injection of penicillin. In addition to penicillin, defendant had tetanus antitoxin, tetanus toxoid and various other medications in his office available for use. He knew that a person could be given an eye or skin test but such tests are unreliable and not ordinarily used in connection with injections of penicillin. It is standard practice not to give such tests, and he gave no tests to plaintiff. The injection given to plaintiff was given in a routine manner.

About five minutes after the injection, while she was still in the reception room, plaintiff began to complain of distress, feeling pin pricks in her hands and head. She looked pale and gradually became in acute distress. Defendant observed that her condition had the characteristics of an anaphylactic reaction to penicillin and in his opinion she was suffering such a reaction. As soon as he observed this condition he administered emergency treatment consisting of adrenalin, and other medications and called an ambulance to take plaintiff to the hospital. He then arranged with an internist at the hospital, who specialized in such problems, to take over plaintiff's care and treatment.

Defendant further testified that plaintiff had suffered a severe anaphylactic reaction or shock. In his experience, none of his patients had ever before had such a severe reaction from penicillin, and he had administered similar injections to patients over the years. There are two categories of reactions to penicillin, one being immediate, such as the type plaintiff sustained, and the other is the so-called allergic-type reaction which may occur two or three weeks later. The adrenalin and other injections he gave plaintiff were consistent with the standard emergency treatment for cases of anaphylactic shock. He did not preserve the disposable hypodermic syringe or needle used in giving plaintiff the injection of penicillin. He threw it away as he always does after he administers the injection. When asked why he made no effort to "preserve the evidence," defendant stated he saw no reason to do so. He assumed, without making any tests, that the penicillin was free from any defects and that defendant's reaction was not due to any defect in the penicillin; in any event, the penicillin was in plaintiff, not in the syringe.

Plaintiff testified that she cut her finger with a knife. After treating it herself for two days she went to defendant's office

for treatment. He discussed giving her a tetanus antitoxin. Her stepfather had died after having such an injection but she did not remember telling defendant about this. She did discuss penicillin with defendant and told him that she had had penicillin many times without reaction and that she did not have any allergies. Defendant told her he would give her an injection of penicillin and did in fact give her an injection in the upper fleshy part of her arm. He then laid the hypodermic needle on the table and she left the examining room. About five minutes later, while she was still in the reception room, she began to feel faint and had painful needle-like sensations on her palms, eyelids and head, and then all over her body. Defendant took her back into the treatment room and gave her more shots which he said would combat the reaction she was having. She noticed defendant pick up a vial and put it into a drawer in his desk. She did not observe what he did with the two or three syringes and needles he had used.

Dr. Daniel Lang, called by plaintiff, testified that he was a practicing physician and surgeon. He had been treating plaintiff for several months. In his opinion tetanus antitoxin would be more likely to cause an anaphylactic shock than penicillin but penicillin is more likely to cause this reaction than some other medications on the market. A person, in his opinion, is not subject to the reaction when penicillin is first administered but only after it has been administered on previous occasions. The fact no reaction is sustained at one time would not mean the patient would not thereafter be subject to developing it when it was later administered. There is no reliable test to determine if a person will have such a reaction to penicillin.

Dr. Paul Reinsch, also called by plaintiff, testified that he took over plaintiff's care and treatment on January 3, 1961, and continued the adrenalin, cortisone and antihistamine therapy initiated by defendant.

Defendant introduced no evidence.

The court refused plaintiff's request for instructions on the doctrine of res ipsa loquitur. Specifically, plaintiff requested and the court refused to give BAJI instructions Nos. 214-W and 206.

''As a general rule, res ipsa loquitur applies where the accident is of such a nature that it can be said, in the light of past experience, that it probably was the result of negligence by someone and that the defendant is probably the person who is responsible. [Citations.] In determining whether such probabilities exist with regard to a particular occurrence, the

courts have relied on both common knowledge and the testimony of expert witnesses. [Citations.]'' (*Siverson* v. *Weber*, 57 Cal.2d 834, 836 [22 Cal.Rptr. 337, 372 P.2d 97].)

Plaintiff maintains that common knowledge may be used in this case to invoke res ipsa loquitur. She places particular reliance on *Wolfsmith* v. *Marsh*, 51 Cal.2d 832 [337 P.2d 70], and *Bauer* v. *Otis*, 133 Cal.App.2d 439 [284 P.2d 133]. These decisions contain language that it is a matter of common knowledge among laymen that injections do not ordinarily cause trouble unless unskillfully done or there is something wrong with the serum. These cases, and cases upon which they rely, involved injections which caused infection, tearing of tissue, nerve injury, wrist drop or similar results. ■ However, the unfortunate reaction which plaintiff suffered did not result from any such cause but was caused by the medicine injected. This is plainly not a situation where common knowledge could provide the necessary foundation. (See *Surabian* v. *Lorenz*, 229 Cal.App.2d 462, 465 [40 Cal. Rptr. 410] ; *LeMere* v. *Goren*, 233 Cal.App.2d 799, 808 [43 Cal.Rptr. 898] ; see also concurring opinion of Chief Justice Traynor in *Quintal* v. *Laurel Grove Hospital*, 62 Cal.2d 154, 170 [41 Cal.Rptr. 577, 397 P.2d 161].)

Plaintiff lays stress on the fact that the reaction she suffered was a rare occurrence. ■ But the law is clear that ''The fact that a particular injury suffered by a patient . . . is something that rarely occurs does not in itself prove that the injury was probably caused by the negligence of those in charge. . . . [Citations.]'' (*Siverson* v. *Weber, supra,* 57 Cal.2d 834, 839.)

The determinative question presented here is whether evidence was offered by expert testimony, that when reactions such as plaintiff suffered occur, they are more probably than not caused by negligence.

■ A review of the evidence, summarized above, dictates the conclusion that there was no evidence whatsoever that any negligence on defendant's part was involved. The three doctors who testified concerning the question, all stated that penicillin can and does produce anaphylactic shock or reaction; none indicated that such occurrence could in any way be attributed to negligence on the part of anyone. (See *Tangora* v. *Matanky*, 231 Cal.App.2d 468, 474 [42 Cal.Rptr. 348].)

■ ''To permit an inference of negligence under the doctrine of res ipsa loquitur solely because an uncommon complication develops would place too great a burden upon the medi-

cal profession. . . ." (*Siverson* v. *Weber, supra,* 57 Cal.2d 834, 839; *Surabian* v. *Lorenz, supra,* 229 Cal.App.2d 462, 466.)

The judgment is affirmed.

Files, P. J., and Kingsley, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied December 14, 1966.