[L.A. No. 29758. In Bank. Dec. 29, 1970.]

DENNIS BARDESSONO, Plaintiff and Respondent, v.
JEAN MICHELS, Defendant and Appellant.

## Counsel

Schauer, Ryon & McIntyre and Robert W. McIntyre for Defendant and Appellant.

Halde, Barrymore & Stevens and Ronald C. Stevens for Plaintiff and Respondent.

## Opinion

**TOBRINER, J.**—For the reasons explained herein, we conclude that the judgment for plaintiff in this medical malpractice action should be affirmed. The trial court properly followed the doctrine of res ipsa loquitur in instructing the jury that it could infer negligence from the happening of the accident alone, if it found from the testimony of physicians called as expert witnesses, common knowledge, and all the circumstances, that the injury was more probably than not the result of negligence.

### 1. *The facts.*

In June 1966, the plaintiff left his work as a radar technician in California for a brief vacation at the farm of his wife's parents in Kansas. During three or four days of his vacation he assisted his father-in-law in cutting and clearing thistles from the fields. He felt a little stiffness in his shoulder, which soon disappeared. After he left Kansas on June 20, 1966, plaintiff returned to his job as a radar technician and performed various chores around his house and property which involved the use of his arm. During that time his arm again began somewhat to bother him, and at night he put ointment on his arm, took an aspirin, and by morning the arm seemed all right. Gradually, however, the soreness in his right shoulder increased, although he continued to be able to move his arm.

On July 12, 1966, plaintiff, thinking that he had pulled a muscle or strained his shoulder, first visited Dr. Jean Michels, an orthopedic surgeon. Dr. Michels examined plaintiff, asked him to perform some arm movements which he found somewhat difficult, and diagnosed his conditions as bicipital tendonitis and posterior shoulder capsulitis. In other words, he was suffering from an inflammation of the tendons and ligaments of his right shoulder—a common condition which normally relates to strenuous physical activity. Using a 5 cc. syringe Dr. Michels proceeded to give plaintiff

four injections[1] of a mixture of cortisone and a local anesthetic (xylocaine) deep into the sore areas of his right shoulder.

When plaintiff received his first injection, he "experienced terrific pain up and down [his] arm." He had never felt such a "terrible pain" in his life from receiving injections; he was trembling and, after the second shot, his right arm lay limp at his side, and he felt a "tingling" sensation as though he had slept on it. When the doctor gave plaintiff two more injections, he again experienced "terrific pain." Upon his complaint, the doctor commented that he was a "big sissy," and said that he "shouldn't carry on like that at the time of the injections." She prescribed empirin with codeine tablets for the pain, instructed plaintiff not to work with the arm, but to perform a few arm exercises.

Plaintiff used the tablets as prescribed and returned to work without using his arm. The pain in his shoulder and the burning sensation persisted and he experienced difficulty in sleeping. His arm grew weak, and on July 15th he again visited Dr. Michels. She instructed him to report to a laboratory for a blood test. He attempted to refrain from taking the pills that the doctor had prescribed for the pain in his shoulder, but he could not sleep and the aching and burning was so great that he resumed taking the pills.

Plaintiff continued to take the pills and to follow the doctor's instructions as to refraining from moving his arm. Yet the arm grew weaker, the pain continued; plaintiff became concerned that the "pills were covering up something that was wrong with this arm." On July 22d plaintiff ceased taking the medicine, could not sleep that night, and experienced difficulty in sitting, dressing himself, writing, or holding his head up. The following morning at 6:30 or 7 a.m. plaintiff went to the emergency ward of the Lompoc Hospital, explained his condition, and asked to be admitted to the hospital. Someone on the hospital staff telephoned Dr. Michels who, upon arrival, informed plaintiff that there was no object in his being admitted to the institution. Dr. Michels ordered that X-rays be taken of the

[1]The record reveals considerable conflict in the evidence as to the number of the injections which the physician gave plaintiff. Plaintiff testified that he received four injections on his first visit to the doctor. Dr. Michels testified that she gave plaintiff only two, but she also admitted, "I wouldn't say that I only entered his skin once, I may have re-entered it—redirected my needle slightly. . . ." Because this court must sustain the verdict in favor of plaintiff if there is any substantial evidence, contradicted or not, to support the jury's conclusion of negligence (*Acosta* v. *Southern Cal. Rapid Transit Dist.* (1970) 2 Cal.3d 19, 27 [84 Cal.Rptr. 184, 465 P.2d 72]), we state the relevant evidence in a light most favorable to plaintiff, resolving all conflicts in his favor and indulging in all legitimate and reasonable inferences to uphold the verdict. (*Clark* v. *Gibbons* (1967) 66 Cal.2d 399, 402 [58 Cal.Rptr. 125, 426 P.2d 525].)

shoulder at the hospital, but the X-rays failed to reveal any cause for plaintiff's distress. The doctor took plaintiff to her office, examined him, discovered that his condition had changed somewhat from his earlier visits, and gave his lower shoulder another injection of xylocaine and cortisone.

After plaintiff's third visit with Dr. Michels on July 23d, his condition deteriorated; he could not write; he could not dress himself without his wife's assistance; the pain continued despite the pills. Plaintiff visited the doctor on July 25th and again on July 28th. The doctor told plaintiff that she was going on a two-week vacation and that if he wanted further treatment, she would be available after her return. Plaintiff said he might visit another doctor during her absence.

Upon the recommendation of his family doctor plaintiff visited Dr. Leonard Burgess, an orthopedic surgeon, on Saturday, July 30th. Plaintiff told the doctor that he was 31 years of age, recounted the history of his shoulder condition, and indicated that he had received several painful injections from Dr. Michels. Dr. Burgess noted that plaintiff's right shoulder revealed wasting and atrophy of the muscles and upon closer examination he discovered complete paralysis of several muscles in the shoulder and back.

Dr. Burgess indicated that plaintiff would be required to stay in a hospital for tests to determine the cause of the muscle paralysis. During the 19 days of plaintiff's stay in the hospital Dr. Burgess traced the nerve supply to the paralyzed muscles and observed that they all combined in a nerve complex called the posterior cord of the brachial plexus. The tests and examinations indicated that the paralysis was caused by trauma to the posterior cord of the brachial plexus, which is a nerve trunk not quite as large as an ordinary pencil, two inches in length, and located deep inside the neck-shoulder region about one and one-half or two inches underneath the skin in the middle of the shoulder.[2]

In the hospital the plaintiff began to receive physical therapy treatment and after his release he has continued such treatment under the care of Dr. Burgess. The therapy has improved his condition. At the time of trial, however, plaintiff still experienced difficulty in performing several simple physical movements with his right arm, such as reaching for his wallet, shifting gears in his automobile, throwing a ball, and swimming. The muscles of his shoulder showed atrophy at trial and Dr. Burgess indicated

---

[2]The record reflects considerable conflict in the testimony as to the precise location of the injections and the injured nerves. This conflict is further obscured and compounded by numerous imprecise references in the testimony to locations on the body and on diagrams.

that plaintiff would probably never completely recover from the effect of the paralysis.

At trial plaintiff's proof went to the point that the injections administered by Dr. Michels on July 12th had caused a trauma to the posterior cord of the brachial plexus and thus resulted in the paralysis and atrophy of plaintiff's shoulder muscles. Dr. Burgess gave support to plaintiff's theory by testifying that the injection of cortisone and xylocaine into the shoulder does not usually cause the sort of pain which plaintiff described and that an injection from the back of the shoulder might get close to the affected nerves if the needle penetrated to that depth. He also testified that the nerve cord lay approximately one and one-half to two inches from the surface and that if the injection had been directed into the proper place, it would not have hit the nerves that suffered damage. In addition, defendant testified that she used a needle two and one-half to three inches long in order to perform the injections. Dr. Burgess indicated that he did not know precisely what caused plaintiff's paralysis, but testified that, assuming the cause was traumatic in origin, this type of injury does not ordinarily occur in the absence of negligence in administering the injection.

In opposition, defendant theorized that plaintiff's nerve damage and paralysis arose not from the medical treatment, but from the original injury to his shoulder. Dr. Gregg, defendant's expert witness, indicated that medical knowledge does not reveal why extremely few people who exercise their muscles too strenuously suffer paralysis while almost all others develop only soreness. He termed this rare condition "paralytic brachial neuritis."[3] Neither Dr. Gregg nor Dr. Burgess explained why plaintiff had not developed paralysis and nerve damage before he visited Dr. Michels and had only begun to suffer these symptoms after the injections. Dr. Burgess, however, did testify that muscles atrophy very rapidly after becoming paralyzed.

Plaintiff requested damages for lost wages, medical expenses, his physical disability, and pain and suffering. After the jury returned a verdict in favor of plaintiff in the sum of $42,000, defendant appealed, raising only two contentions: (1) The trial court committed prejudicial error in instructing the jury that under the doctrine of res ipsa loquitur it may consider the expert testimony and "the common knowledge among laymen that injections in the arm, as well as other portions of the body, do not ordinarily cause trouble unless unskillfully done. . . ." (2) The trial court

---

[3]See generally Evans, *Paralytic Brachial Neuritis* (1965) 65 New York State Journal of Medicine 2926; Kennedy & Resch, *Paralytic Brachial Neuritis* (1966) 86 Journal-Lancet 459.

erred in refusing to grant a new trial upon an allegation that the jury committed misconduct during its deliberations.

2. *The trial court properly rendered an instruction which permitted the jury to apply the doctrine of res ipsa loquitur to the present case.*

■ The courts require only that physicians and surgeons exercise in diagnosis and treatment that reasonable degree of skill, knowledge, and care ordinarily possessed and exercised by members of the medical profession under similar circumstances. (*Sinz* v. *Owens* (1949) 33 Cal.2d 749, 753 [205 P.2d 3, 8 A.L.R.2d 757]; *Lawless* v. *Calaway* (1944) 24 Cal. 2d 81, 86 [147 P.2d 604]; see Comment, 14 Stan.L.Rev. 884, 891-892.)

■ In deciding whether physicians and surgeons have met this standard the trier of fact may infer failure of the practitioner to have done so in cases in which the happening of the accident does not normally occur in the absence of negligence. ■ This doctrine of res ipsa loquitur[4] applies in cases in which (1) the accident is of a kind which ordinarily does not occur in the absence of someone's negligence (*Ybarra* v. *Spangard* (1944) 25 Cal.2d 486, 489 [154 P.2d 687, 162 A.L.R. 1258]) and (2) defendant is probably the person who is responsible. (*Tomei* v. *Henning* (1967) 67 Cal.2d 319, 322 [62 Cal.Rptr. 9, 431 P.2d 633].)[5]

"The increasing use of res ipsa loquitur exemplifies the growing recognition of the courts of the special obligations which arise from particular relationships." (*Cho* v. *Kempler* (1960) 177 Cal.App.2d 342, 348 [2 Cal.Rptr. 167, 76 A.L.R.2d 774], hg. den.; see Rintala, *Foreword: "Status" Concepts in the Law of Torts* (1970) 58 Cal.L.Rev. 80.) In cases

---

[4]After the trial in the present case, the Legislature enacted Evidence Code section 646 which codifies the doctrine of res ipsa loquitur. (Stats. 1970, ch. 69, § 1.)

[5]In *Ybarra* v. *Spangard, supra,* 25 Cal.2d 486, 489, the court established three conditions for the application of the res ipsa doctrine: " '(1) the accident must be of a kind which ordinarily does not occur in the absence of someone's negligence; (2) it must be caused by an agency or instrumentality within the exclusive control of the defendant; (3) it must not have been due to any voluntary action or contribution on the part of the plaintiff.' (Prosser, Torts, p. 295.)" More recently in *Zentz* v. *Coca Cola Bottling Co.* (1952) 39 Cal.2d 436, 446 [247 P.2d 344], the court simplified and reduced the three original conditions into two propositions without any loss in meaning: "[A]s a general rule, res ipsa loquitur applies where the accident is of such a nature that it can be said, in the light of past experience, that it probably was the result of negligence by someone and that the defendant is probably the person who is responsible." (See *Tomei* v. *Henning, supra,* 67 Cal.2d 319, 322; *Clark* v. *Gibbons, supra,* 66 Cal.2d 399, 408; *Fowler* v. *Seaton* (1964) 61 Cal.2d 681, 686 [39 Cal.Rptr. 881, 394 P.2d 697]; 1 Louisell & Williams, Medical Malpractice (1969) § 14.04, at p. 428; Prosser, Law of Torts (3d ed. 1964) 225; Comment, *Res Ipsa Loquitur in California Medical Malpractice Cases—A Presumption or Inference?* (1970) 1 Pacific L.J. 637, 638-639.) In the instant case the only question is whether the first condition of the doctrine is present.

in which "the particular defendant is in a position of some special responsibility toward the plaintiff or the public" (Prosser, *Res Ipsa Loquitur in California* (1949) 37 Cal.L.Rev. 183, 224), the doctrine protects the dependent party from unexplained injury at the hands of one in whom he has reposed trust. "In an integrated society where individuals become inevitably dependent upon others for the exercise of due care, where these relationships are closely interwoven with our daily living, the requirement for explanation is not too great a burden to impose upon those who wield the instruments of injury and whose due care is vital to life itself." (*Cho v. Kempler, supra,* 177 Cal.App.2d 342, 349; *Salgo v. Leland Stanford etc. Bd. Trustees* (1957) 154 Cal.App.2d 560, 568-569 [317 P.2d 170], hg. den.; 1 Louisell & Williams, Medical Malpractice, *supra,* §§ 15.01-15.02, at pp. 461-466; see *Clark v. Gibbons, supra,* 66 Cal.2d 399, 414 (concurring opn. of Tobriner, J.); 2 Harper & James, Law of Torts (1956) § 19.5, at pp. 1079-1081.)

Illustrative of the growing application of the res ipsa loquitur doctrine is the wide variety of cases in which courts have found sufficient common knowledge and observation among laymen, regardless of expert testimony, to indicate "that the consequences of the professional treatment were not such as ordinarily would have followed if due care had been exercised" so as to raise an inference of negligence. (*Cavero v. Franklin etc. Benevolent Soc.* (1950) 36 Cal.2d 301, 309 [223 P.2d 471].)[6] In other medical malpractice cases, usually involving complex or rare medical procedures,

---

[6]*Meier v. Ross General Hospital* (1968) 69 Cal.2d 420, 429-431 [71 Cal.Rptr. 903, 445 P.2d 519] (psychiatric patient commits suicide by jumping from a window in a mental institution after the staff leaves the window unlocked); *Davis v. Memorial Hospital* (1962) 58 Cal.2d 815, 816-817 [26 Cal.Rptr. 633, 376 P.2d 561] (patient develops a rectal abscess following a routine presurgical enema); *Leonard v. Watsonville Community Hosp.* (1956) 47 Cal.2d 509, 514 [305 P.2d 36] (clamp left in abdomen); *Cavero v. Franklin etc. Benevolent Soc., supra,* 36 Cal.2d 301, 311 (death results from tonsillectomy); *Dierman v. Providence Hospital* (1947) 31 Cal.2d 290, 292, 295 [188 P.2d 12] (anesthetic gases explode in the operating room); *Ybarra v. Spangard, supra,* 25 Cal.2d 486, 488-489 (shoulder injury during appendectomy); *Guilliams v. Hollywood Hospital* (1941) 18 Cal.2d 97, 100, 102 [114 P.2d 1] (patient receives an injury to a part of body unrelated to the part being treated: broken rib in kidney operation); *Ales v. Ryan* (1936) 8 Cal.2d 82, 95-96 [64 P.2d 409] (foreign object left in patient's body after surgery: sponge left in abdomen); *McBride v. Saylin* (1936) 6 Cal.2d 134, 138 [56 P.2d 941] (physician fails to take X-rays of possible fracture); *Timbrell v. Suburban Hospital, Inc.* (1935) 4 Cal.2d 68, 70-71 [47 P.2d 437] (patient receives burns from hot water bottles or hot compresses); *Barham v. Widing* (1930) 210 Cal. 206, 214-215 [291 P.2d 173] (patient receives infection from unsterilized equipment); *Meyer v. McNutt Hospital* (1916) 173 Cal. 156, 158-159 [159 P.2d 436]; *Cho v. Kempler, supra,* 177 Cal.App.2d 342, 348-352 (patient's facial nerve is severed in a mastoidectomy); *Mayers v. Litow* (1957) 154 Cal.App.2d 413, 419-420 [316 P.2d 351] (left vocal cord is paralyzed after removal of a cyst from patient's thyroid gland); Note, *The Application of Res Ipsa Loquitur in Medical Malpractice Cases* (1966) 60 Nw.U.L.Rev. 852, 857-864.

courts have found insufficient common knowledge among laymen to apply the doctrine of res ipsa loquitur, but have required expert testimony in order to establish the requisites of the doctrine.[7]

■ In cases in which the physician or surgeon has injected a substance into the body, the courts have followed the test that if the routine medical procedure is relatively commonplace and simple, rather than special, unusual and complex, the jury may properly rely upon its common knowledge in determining whether the accident is of a kind that would ordinarily not have occurred in the absence of someone's negligence. (*Berkey* v. *Anderson* (1969) 1 Cal.App.3d 790, 799 [82 Cal.Rptr. 67] (hg. den.).)[8]

■ Whether the case falls into the category of the commonplace or the unusual must necessarily turn upon a conglomerate of medical facts; only if the facts clearly show that the procedure is so unusual and complex that the jury could not rest their understanding of it upon their common knowledge should the court refuse a tendered res ipsa loquitur instruction, based on common knowledge. We proceed to an analysis of some principal injection cases to illustrate the use of the test.

In *Bauer* v. *Otis* (1955) 133 Cal.App.2d 439, 440-442 [284 P.2d 133] (hg. den.), a nurse injected Thex, a vitamin B complex, into the deltoid

---

[7]*Tomei* v. *Henning, supra,* 67 Cal.2d 319, 322-323 (suture of right ureter during hysterectomy in which injury was one of inherent risks of the operation); *Siverson* v. *Weber* (1962) 57 Cal.2d 834, 839 [22 Cal.Rptr. 337, 372 P.2d 97] (development of a fistula after hysterectomy); *Farber* v. *Olkon* (1953) 40 Cal.2d 503, 510-511 [254 P.2d 520] (broken leg during electro-shock treatment in a mental hospital); *Huffman* v. *Lindquist* (1951) 37 Cal.2d 465, 474 [234 P.2d 34, 29 A.L.R.2d 485] (failure to diagnose a brain injury); *Lawless* v. *Calaway, supra,* 24 Cal.2d 81, 86-89 (failure to diagnose appendicitis after patient had eaten a moldy bologna and other symptoms indicated ptomaine poisoning); cf. *Quintal* v. *Laurel Grove Hospital* (1964) 62 Cal.2d 154, 162-163 [41 Cal.Rptr. 577, 397 P.2d 161] (cardiac arrest during administration of anesthetic; court did not decide whether expert testimony would be required).

[8]The defendant in a medical malpractice case may attempt to rebut the inference of negligence that arises from the doctrine of res ipsa loquitur by introducing evidence that the physician utilized medical procedures which involve an inherent risk of injury even when due care is used. For example, in *Tangora* v. *Matanky* (1964) 231 Cal. App.2d 468, 473-474 [42 Cal.Rptr. 348], (hg. den.), the trial court properly rendered a res ipsa loquitur instruction, but the jury found for defendant because the inference of negligence had been rebutted by testimony that in a small percentage of cases an injection of penicillin results in an anaphylactic shock such as that suffered by the deceased plaintiff and that such an accident occurs in the absence of any negligence of the doctor. Defendant in the present case, however, did not contend that plaintiff's paralysis constituted an inherent or "calculated" risk of the cortisone injections. We cite, without necessarily approving, other injection cases involving the "calculated" risk problem: *Campos* v. *Weeks* (1966) 245 Cal.App.2d 678, 682 [53 Cal.Rptr. 915], (hg. den.); *Surabian* v. *Lorenz* (1964) 229 Cal.App.2d 462, 465-468 [40 Cal. Rptr. 410], (hg. den.); *Horace* v. *Weyrauch* (1958) 159 Cal.App.2d 833, 836-838 [324 P.2d 666]; Rubasmen. *Res Ipsa Loquitur in California Medical Malpractice Law —Expansion of a Doctrine to the Bursting Point* (1962) 14 Stan.L.Rev. 251, 277-280.

muscle of plaintiff's right arm. When the needle was inserted, plaintiff felt a terrific pain that engulfed his entire arm. Never before had injections caused such a severe, sharp pain. In addition, plaintiff immediately suffered "wrist drop"—a condition that impaired the movement of his right hand. In an operation to cure the "wrist drop" plaintiff's doctor discovered a lesion on the right radial nerve that had occurred at the time of the injection and had caused the "wrist drop." The court observed, "Needle injections of cold shots, penicillin, and many other serums have become commonplace today. Hardly a man, woman or child (even those of tender age) exists in this country who has not had injections of one kind or another. . . . So the giving and receiving of injections and the lack of nerve injury therefrom ordinarily has become a matter of common knowledge. If something does go wrong it is a matter for explanation by the person causing the injury." (133 Cal.App.2d at p. 444.) Hence, the court concluded that a res ipsa loquitur instruction was proper because the medical procedure was commonplace.

In *Wolfsmith* v. *Marsh* (1959) 51 Cal.2d 832, 833-834 [337 P.2d 70, 82 A.L.R.2d 1257], the plaintiff received at least four injections of sodium pentathol without suffering any allergic reaction or other harm. On the fifth occasion, however, the doctor injected sodium pentathol into the inner aspect of plaintiff's right knee; the patient suffered extreme pain for 63 days thereafter, developed blood clotting, and finally a "slough ulcer" appeared at the site of the injection. This court found that the medical procedure used was sufficiently commonplace to support a res ipsa loquitur instruction. (51 Cal.2d at p. 835.)[9]

We now turn to two cases in which the medical procedures were far from routine: In *Salgo* v. *Leland Stanford etc. Bd. Trustees, supra,* 154

---

[9]Other injection cases in which the doctrine of res ipsa loquitur has been applied include: *Seneris* v. *Haas* (1955) 45 Cal.2d 811, 825 [291 P.2d 915, 53 A.L.R.2d 124] ("plaintiffs have made out a prima facie case by both medical testimony and common knowledge" that a woman does not ordinarily become permanently paralyzed following childbirth after having had a spinal anesthetic); *Barham* v. *Widing, supra,* 210 Cal. 206, 214-215 (patient received infection from unsterilized hypodermic needle); *Berkey* v. *Anderson, supra,* 1 Cal.App.3d 790, 799 (hg. den.) ("it is shown from the record (if it is not a matter of common knowledge), that a myelogram is a 'commonplace procedure' rather than unusual or complex"); *Dunlap* v. *Marine* (1966) 242 Cal.App.2d 162, 175-177 [51 Cal.Rptr. 158] (hg. den.) (trial court, without a jury, considered res ipsa loquitur doctrine in case involving cardiac arrest during administration of anesthetic, but found in favor of defendant upon conflicting testimony; Court of Appeal affirmed); *Sherman* v. *Hartman* (1955) 137 Cal.App.2d 589, 595 [290 P.2d 894] (court found it unnecessary to decide "whether the common experience of a layman in blood transfusion cases is that the results here do not occur in the absence of negligence"). These cases do not suggest any distinction between the application of the doctrine of res ipsa loquitur to injuries that occur at the site of an injection and the application of the doctrine to injuries that occur elsewhere in the body.

Cal.App.2d 560, 565-568, the defendant doctor performed a translumbar aortography in which the aorta was punctured and radio-opaque substance injected to determine the location of a suspected block in plaintiff's circulatory system. The next morning plaintiff awoke and found that his lower extremities were permanently paralyzed. The court observed, "There can be little question but that aortography and its results, because it is a relatively new diagnostic procedure, is not a matter of common knowledge among laymen. . . . Very few laymen have ever heard of it. . . . It is a matter outside the realm of the laymen's experience. . . ." (154 Cal.App.2d at pp. 570-571.) Hence, the court concluded that the aortography was sufficiently complex and unusual to render inappropriate a res ipsa loquitur instruction based on common knowledge.

In *LeMere* v. *Goren* (1965) 233 Cal.App.2d 799, 801-802 [43 Cal. Rptr. 898] (hg. den.), the plaintiff complained of pains at the base of his neck with associated headaches. In order to relieve this condition defendant doctor attempted to give plaintiff an injection of novocain in the brachial plexus nerves at the base of his neck. Plaintiff suffered severe pain and paralysis of his right arm and hand. The court noted expert testimony "that it was contrary to the standards among doctors in good standing in the community to inject novocain, for the purpose of relieving pain and muscle spasm, into any nerve; that an injury to a nerve as a result of an injection was not acceptable under such standards. . . ." (233 Cal.App.2d 799, 803.) Hence, the court, holding that a res ipsa loquitur instruction based upon expert testimony should have been rendered, reversed a jury verdict in favor of the defendant. In dictum, however, the court rejected a res ipsa instruction based upon common knowledge. The court explained: "In the present case there is medical testimony that a novocain injection into the brachial plexus area, properly done, may by chance result in injury to the nerve. With respect to this particular type of injection, common knowledge of laymen is 'not a reliable foundation.'" (233 Cal.App.2d at p. 808.)

The record in this case contains substantial evidence[10] that plain-

---

[10]After Dr. Michels indicated her diagnosis of plaintiff's shoulder, she was asked, "Now, the condition is not an unusual one for an orthopedic surgeon to see, is it?" Dr. Michels: "Quite common." Later, she testified that she gave similar injections "perhaps 20 or 30 [times] a week." Plaintiff testified that although he had a similarly sore shoulder for brief periods after "throwing pretty hard" while playing baseball or after doing strenuous garden work, this occasion marked the first time that he had visited a doctor for treatment of the soreness. Plaintiff's present doctor was asked whether tendonitis is caused by physical exertion and he responded, "Usually, that is the usual cause of it." Counsel: "It is something that you would see in at least, for example, I read in the papers where Johnny Unitas has tendonitis, that is an inflammation of exertion?" Doctor: "That is the most common cause, chronic stresses of the tendon." The defendant's expert witness was asked whether it is common practice

tiff's tendonitis condition was most commonplace; that injections of cortisone and a local anesthetic were the normal, common treatment for this condition, and that untoward results were extremely rare.[11]

This case, therefore, involves a relatively simple, rather than complex, procedure in which the physician injected a fluid into the body. The jury could accordingly rely upon its common knowledge in determining whether the accident was of a kind that would ordinarily not have occurred in the absence of someone's negligence. Thus, the trial court properly instructed the jury that if it found from expert testimony, common knowledge, and all the circumstances that the injury was more probably than not the result of negligence, it could infer negligence from the happening of the accident alone.

3. *The trial court properly denied a new trial for alleged misconduct of the jury.*

We find no basis for reversal of the trial court's denial of a new trial upon defendant's proffered ground that the jury engaged in three types of misconduct: (1) the jury reached a chance verdict; (2) the jury foreman conferred with the bailiff concerning the legal effect of the jury's failure to reach a verdict; (3) two jurors presented facts to the jury which emanated from their independent research and personal knowledge. Defendant supported this contention by an affidavit of the single juror who had dissented from the verdict at the polling of the jury. Plaintiff countered with contradictory oral testimony of the foreman and two other jurors.

Initially we shall explain that in a hearing on a motion for new trial, the use of oral testimony, to which no objection is tendered, does not taint the procedure with a jurisdictional defect. Although we find no authority for the reception of oral testimony at the hearing on a motion for

---

among both general practitioners and orthopedic surgeons to inject the tendon and joint with a mixture of a local anesthetic and a cortisone derivative, and he responded, "Yes, I am aware that it is common practice." Later he was asked, "Almost routine, is it not?", and he answered, "I think it is very common."

[11]Defendant contends that the medical testimony only indicated that it was "possible" that plaintiff's condition had been caused by the injections and not that the injury was ordinarily or "probably" caused by defendant's negligence in administering the injections. (See *Tomei* v. *Henning, supra,* 67 Cal.2d 319, 322; *Ybarra* v. *Spangard, supra,* 25 Cal.2d 486, 489.) But in determining whether the occurrence of injury is of such a nature that it probably was the result of the negligence of someone under the res ipsa loquitur doctrine, the trier of fact may rely on both medical testimony and common knowledge. (*Clark* v. *Gibbons, supra,* 66 Cal.2d 399, 408.) Using both common knowledge and medical testimony the jury in the present case found that plaintiff's paralysis was more probably than not the result of defendant's negligence. Plaintiff did not need to rely solely upon medical testimony to establish the requisites of the res ipsa loquitur doctrine.

new trial, except in a case in which a necessary witness has refused an affidavit or deposition (*Saltzman* v. *Sunset Tel. etc. Co.* (1899) 125 Cal. 501, 503 [58 P. 169]), we do not regard the procedure of proof as jurisdictional in nature. (Evid. Code, § 353; see *Nichols* v. *Hast* (1965) 62 Cal.2d 598, 601 [43 Cal.Rptr. 641, 400 P.2d 753; *Pao Ch'en Lee* v. *Gregoriou* (1958) 50 Cal.2d 502, 505-506 [326 P.2d 135]; *Webber* v. *Webber* (1948) 33 Cal.2d 153, 164-165 [199 P.2d 934]; *Boynton* v. *McKales* (1956) 139 Cal.App.2d 777, 782 [294 P.2d 733]; Witkin, Cal. Evidence (1966) §§ 1285-1287, at pp. 1188-1191.)

█ Defendant raised no objection in the trial court either to the form of plaintiff's proof or the lateness of the testimony, which came in after the 10-day period permitted by Code of Civil Procedure section 659a. (Cf. *Cembrook* v. *Sterling Drug Inc.* (1964) 231 Cal.App.2d 52, 66-67 [41 Cal.Rptr. 492] (hg. den.).) Under these circumstances, we cannot set aside on appeal the procedure followed by the court in permitting oral testimony on a motion for a new trial.

As we have pointed out, defendant's motion rested in the first instance upon the ground that the jury had improperly arrived at a quotient verdict. At the date of the hearing on the motion, testimony of a juror was admissible to impeach a jury verdict only if such testimony tended to establish: (1) that the jury had arrived at a "chance" or "quotient" verdict; (2) that a juror had concealed bias on *voir dire* examination; (3) that a juror had concealed on *voir dire* examination that he did not intend to follow the court's instructions; and (4) that a juror was mentally incompetent at the time of trial. "Affidavits or other testimony of a juror was not admissible to impeach a jury verdict for any other reason." (*Clemens* v. *Regents of the University of Cal.* (1970) 8 Cal.App.3d 1, 18 [87 Cal.Rptr. 108] (hg. den.); see Code Civ. Proc., § 657, subd. 2; *People* v. *Hutchinson* (1969) 71 Cal.2d 342, 346-348, 351 [78 Cal.Rptr. 196, 455 P.2d 132].)

██ Although a final quotient verdict has long been recognized as illegal (see *Dixon* v. *Pluns* (1893) 98 Cal. 384, 387 [33 P. 268]), and subject to impeachment upon a juror's affidavit (Code Civ. Proc., § 657, subd. 2), defendant's showing failed to establish that such a verdict has been reached here. Defendant alleged that the jury had arrived at its verdict by adding to a total sum the damages favored by each of the 12 jurors and then dividing that total sum by 12 to reach a final decision. Plaintiff, however, produced the testimony of two jurors indicating that the jurors had *not* agreed that they would be bound by the figure arrived at by this quotient method, that the jury later revised the quotient figure, and ultimately agreed upon the revised damages. █ Hence, this case is governed by the rule set forth in *Balkwill* v. *City of Stockton* (1942) 50

Cal.App.2d 661, 671 [123 P.2d 596] (hg. den.): "A quotient verdict does not necessarily constitute a chance verdict, provided the average sum which is thus procured is not adopted without subsequent consideration or balloting by the jurors. If, after a quotient figure is obtained, the jurors discuss and ballot upon the adoption or rejection of that sum, it is conclusive evidence they were not bound by a previous agreement to accept it without further consideration." (See *Will* v. *Southern Pacific Co.* (1941) 18 Cal.2d 468, 477-478 [116 P.2d 44]; *City of Pleasant Hill* v. *First Baptist Church* (1969) 1 Cal.App.3d 384, 433-435 [82 Cal.Rptr. 1] (hg. den.).)

 Defendant's two other grounds for a new trial were that (1) the bailiff had purportedly said "A decision has to be arrived at in this case," which "was heard by the jury and was interpreted by them to mean that the plaintiff would not retry his case in the event of a deadlock" and (2) two jurors had engaged in their own research at home and had reported the results to the jury. Although, prior to *People* v. *Hutchinson, supra,* 71 Cal.2d 342, 346-348, a juror would not have been a competent witness to impeach a verdict on either of such bases (see Evid. Code, § 1150; *People* v. *Gidney* (1937) 10 Cal.2d 138, 146 [73 P.2d 1186]; *Walter* v. *Ayvazian* (1933) 134 Cal.App. 360, 363-365 [25 P.2d 526]), *Hutchinson* has expanded the rule. Relying upon the then newly enacted Evidence Code, the *Hutchinson* court ruled, "We therefore hold that jurors are competent witnesses to prove objective facts to impeach a verdict under section 1150 of the Evidence Code." (71 Cal.2d at p. 351; see *People* v. *Stevenson* (1970) 4 Cal.App.3d 443, 444-445 [84 Cal.Rptr. 349].)

 Apparently foreseeing the soundness of the *Hutchinson* approach, the trial court in the instant case permitted the introduction into evidence of both the dissenting juror's affidavit and the opposing oral testimony as to the conduct of the jury. The trial court considered this evidence; it denied the motions for new trial. Ample evidence supported its finding that misconduct did not occur, or that whatever conduct did occur could not have materially affected the substantial rights of defendant. (Code Civ. Proc., § 657.)

As Witkin has observed, "The trial judge is familiar with the evidence, witnesses and proceedings, and is in the best position to determine whether, in view of all the circumstances, justice demands a retrial." (3 Witkin, Cal. Procedure (1954), Attack on Judgment in Trial Court, § 10, at p. 2054.) Since the affidavits and oral testimony present questions of fact for the trial court, we do not disturb the findings of that court in the absence of a showing of a clear abuse of discretion. (See *People* ex rel. *Dept. Pub. Wks.* v. *Hunt* (1969) 2 Cal.App.3d 158, 172 [82 Cal.Rptr. 546]; *Brickell*

v. *Wittmar* (1959) 175 Cal.App.2d 190, 195-196 [345 P.2d 494]; *Monroe* v. *Lashus* (1959) 170 Cal.App.2d 1, 6-7 [338 P.2d 13]; *Dunford* v. *General Water Heater Corp.* (1957) 150 Cal.App.2d 260, 265 [309 P.2d 958]; *Buhl* v. *Wood Truck Lines* (1944) 62 Cal.App.2d 542, 544-546 [144 P.2d 847] (hg. den.).) In the absence of a showing of an abuse of discretion, we conclude that the trial court's denial of the motion for a new trial must be upheld. In sum, since the trial court admitted and considered both the affidavit of the dissenting juror and the contradictory oral testimony of the jurors regarding the allegations of jury misconduct, and since the court's findings are supported by the evidence, we conclude that the court properly denied the motion for a new trial.

The judgment is affirmed.

Wright, C. J., McComb, J., Peters, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

Appellant's petition for a rehearing was denied January 28, 1971.