Filed 4/29/13

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| BARRY S. JAMESON, | D060029 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. GIS9465) |
| TADDESE DESTA, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of San Diego County, Timothy B. Taylor, Judge.  Reversed.

Barry S. Jameson, in pro. per., for Plaintiff and Appellant.

La Follette, Johnson, De Haas, Gesler & Ames, James J. Wallace II, Russell M. Mortyn and David J. Ozeran for Defendant and Respondent.

I.

INTRODUCTION

More than a decade ago, Barry S. Jameson filed a complaint against Dr. Taddesse Desta that asserted numerous claims stemming from Desta's allegedly negligent medical treatment of Jameson's hepatitis while Jameson was incarcerated at the Richard J. Donovan Correctional Facility (Donovan).  In two separate prior appeals, this court

reversed dismissals of Jameson's lawsuit, concluding that the trial court had erred in dismissing the action on procedural grounds. (*Jameson v. Desta* (July 2, 2007, D047284) [nonpub. opn.] opn. mod. July 26, 2007 (*Jameson I*); *Jameson v. Desta* (Nov. 23, 2009, D053089) [cert. for partial pub. opn.] 179 Cal.App.4th 672 (*Jameson II*).)

On remand from *Jameson II*, Desta filed a motion for summary judgment or summary adjudication of the two remaining claims pending against him—breach of fiduciary duty and professional negligence.[1] The trial court granted Desta's motion for summary adjudication of the breach of fiduciary duty claim on the ground that Jameson could not establish that Desta had breached any legal duty owed to Jameson. The court subsequently concluded that Desta was entitled to judgment as a matter of law on Jameson's professional negligence claim, as well. The court reasoned that Jameson could not establish that Desta's acts had caused him to suffer harm because Desta had cured Jameson of hepatitis. The court granted Desta's motion for summary judgment, and entered judgment in his favor.

On appeal, Jameson claims that the trial court erred in granting Desta's motion for summary judgment. With respect to his claim of breach of fiduciary duty, Jameson maintains that he alleged that Desta breached his duty to obtain Jameson's informed consent prior to prescribing a course of treatment for Jameson's hepatitis, and that Desta

---

[1] In May 2005, Desta filed a demurrer to several of the eight causes of action in the complaint. The trial court sustained Desta's demurrer without leave to amend as to the third, fifth, sixth, seventh, and eighth causes of action. The fourth cause of action did not apply to Desta. The trial court overruled Desta's demurrer as to the first cause of action for breach of fiduciary duty, and as to the second cause of action for professional negligence, the only remaining causes of action at issue in this matter.

2

failed to address this theory of liability in his motion. With respect to his professional negligence claim, Jameson contends that the record contains evidence that establishes a triable issue of fact with respect to whether Desta's actions caused him to suffer harm.

We agree with Jameson that the trial court erred in granting judgment as a matter of law in favor of Desta on Jameson's claims. With respect to his breach of fiduciary duty claim, Jameson alleged in his complaint that Desta breached his fiduciary duty by prescribing the drug interferon to Jameson without first having obtained Jameson's informed consent. Desta failed to address this theory of liability in his moving papers, and thus failed to carry his burden of making a "prima facie showing of the nonexistence of any triable issue of material fact." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).) The trial court therefore erred in granting summary judgment as to this cause of action.

With respect to Jameson's professional negligence claim, we conclude that the trial court erred in determining that Desta was entitled to summary judgment on the ground that Jameson failed to present admissible evidence that would negate Desta's expert's opinion that Desta had cured Jameson of hepatitis. Jameson's professional negligence claim is not premised on a *failure to cure* Jameson, but rather, on the allegation that Desta performed below the standard of care in *unnecessarily prescribing a medication* that had significant and damaging side effects at a time when Jameson was not suffering from hepatitis. The trial court erred in granting judgment as a matter of law in favor of Desta on the ground that Jameson failed to present evidence demonstrating a triable issue of a

3

fact as to whether Desta had cured Jameson, when that fact was not material to Jameson's claim.

Further, Desta was not entitled to summary judgment on the ground that he established that Jameson will be unable to prove that Desta's alleged breach of the standard of care caused Jameson to suffer physical injury. Jameson offered the declaration of a medical doctor, Dr. Allen Cooper, who stated, "It is my professional opinion that [Desta's] care and treatment of Jameson was substandard and a direct cause of the suffering and injury to Jameson and contrary to the prevailing standard of care in the medical community in 2000-2001." Dr. Cooper also indicated in his declaration that Desta had acted below the standard of care in subjecting Jameson to interferon injections three times a week for a year, and that instead, Desta should have prescribed six months of an alternative treatment. Jameson thus presented expert testimony that Desta's breach of the standard of care caused Jameson to receive numerous unnecessary injections of interferon. A reasonable jury could find that these injections were painful and inherently injurious.

In addition to the statements that Desta's breach of the standard of care caused Jameson to receive unnecessary injections of interferon, at his deposition, Dr. Cooper stated that Jameson had suffered various side effects from the interferon injections. We conclude that Jameson established a triable issue of fact as to the causation element of his

4

professional negligence claim through the deposition testimony and declaration of Dr. Cooper.[2]

Finally, in light of our remand, we remind the trial court of its obligation to " 'ensure indigent prisoner litigants are afforded meaningful access to the courts. . . .' " (*Jameson II*, *supra*, 179 Cal.App.4th at p. 675, quoting *Apollo v. Gyaami* (2008) 167 Cal.App.4th 1468, 1483 (*Apollo*).) As discussed in greater detail in part III.D., *post*, the record indicates that the trial court failed to carry out this obligation in at least one critical aspect. Notwithstanding Jameson's timely request that the trial court direct defense counsel to ensure that Jameson be permitted to participate telephonically in defense counsel's deposition of Jameson's expert, Dr. Cooper, the trial court failed to rule on Jameson's request prior to the time the deposition was taken. As a result, defense counsel was permitted to depose Jameson's key expert witness without Jameson being afforded the opportunity to participate in the deposition. By failing to ensure Jameson's ability to participate in the deposition, the trial court fell short of its obligation to protect an " 'indigent prisoner's right to . . . prosecute bona fide civil actions.' " (*Apollo*, *supra*, at p. 1483.)

---

[2] We reject Desta's argument that we may affirm the judgment on the alternative ground that he established that Dr. Cooper's expert opinion has "no value" because Dr. Cooper did not address the "different" standard of care purportedly applicable to the medical treatment of prisoners. (See pt. III.C.2., *post*.)

We reverse the judgment and remand for further proceedings.[3]

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The operative allegations in Jameson's complaint*

In April 2002, Jameson filed a complaint that alleged eight causes of action, including breach of fiduciary duty (lack of informed consent); professional negligence; general negligence; failure to train; battery; violation of civil rights; intentional infliction of emotional distress; and violation of due process against a number of defendants, including Desta and officials of the California Department of Corrections and

---

[3]    Jameson raises a number of other claims on appeal, the bulk of which we need not, and do not, address in light of our reversal of the summary judgment. For example, Jameson argues that various trial court rulings had the effect of denying him discovery "that would have defeated summary judgment."

Jameson also argues on appeal that the trial court abused its discretion in denying his motion to exclude evidence of a prior felony conviction at trial. (See *Robbins v. Wong* (1994) 27 Cal.App.4th 261, 274 ["upon proper objection to the admission of a prior felony conviction for purposes of impeachment in a civil case, a trial court is bound to perform the weighing function prescribed by [Evidence Code] section 352"].) Because this issue may recur on remand, we address it. The trial court ruled that Jameson's conviction would be admissible to impeach his credibility if he were to testify at trial. Jameson has failed to demonstrate on appeal that the court abused its discretion in so ruling. (See, e.g., *People v. Mullens* (2004) 119 Cal.App.4th 648, 658 ["A trial court has broad discretion in determining whether to admit or exclude evidence objected to on the basis of [Evidence Code section] 352 [citation], and rulings under that section will not be overturned absent an abuse of that discretion [citation]"].) We therefore reject Jameson's contention.

We also reject Jameson's contention that defense counsel committed fraud and misrepresentation in the trial court by arguing "facts he knew to be false and with[holding] evidence requested in discovery to obtain summary judgment/adjudication." We see nothing in the record to substantiate Jameson's contentions in this regard.

6

Rehabilitation (Department).[4]   Jameson's claims of breach of fiduciary duty and professional negligence against Desta are the sole claims at issue in this appeal.

In his complaint, Jameson alleged that Desta negligently prescribed interferon to Jameson while Jameson was incarcerated at Donovan and Desta was performing services as a physician for the Department.  Jameson further alleged that the interferon caused him to suffer serious physical injuries, including irreversible damage to his eyesight.  With respect to his breach of fiduciary duty claim, Jameson alleged in part:

> "Desta breached his fiduciary duty as a doctor when he started [Jameson] on Alpha-2B Interferon, when [Jameson] had no detectable viral count.  [The Department's] written policy . . . clearly states if a person has a viral count that does not exceed 3,499, a person is not to be given interferon treatment.  Moreover, such treatment is to be reviewed every six (6) months to review whether such treatment should be continued.   . . . Desta simply continued [Jameson] on treatment [Jameson] should never have been on with deliberate indifference and a reckless disregard for the rights[,] health and safety of [Jameson], causing irreparable injury. . . .  This second six months aggravated the injuries to [Jameson] unnecessarily.
>
> "Desta held a position of trust with [Jameson], causing [Jameson] to rely on Desta's statements and recommendation that [Jameson] begin treatment and stay on it.  It is only through [Jameson's] research of his own medical file and hepatitis literature that even as a layman he easily discovered the mistaken or malicious prescription by Desta that resulted in such damage."

In his professional negligence cause of action, Jameson alleged that Desta had been "professionally negligent in his treatment of [Jameson], and there existed a physician-patient relationship."   Jameson also alleged the following:

---

[4]      Desta is the only respondent in this appeal.

"Due to Desta's professional negligence and failure to exercise the proper degree of knowledge and skill in diagnosing, treating and monitoring any such treatment, [Jameson] suffered and suffers extreme migraine headaches, vision loss, weight loss, depression and severe emotional duress. [Jameson] suffered such due to Desta ordering that [Jameson] take interferon treatment that [Jameson] did not need and local regulations precluded or excluded [Jameson] from taking. [Jameson] and Desta shared a position of trust, and Desta acted in the capacity of a 'specialist' in the field of [h]epatology.

"[Jameson's] liver condition never showed what is called a 'viral count,' and at all times relevant to this matter, [Jameson's] viral count was undetectable. Therefore, [Jameson] should have never been subjected to what amounted to cancer treatment and all the suffering that is attached thereto."

B.    *Desta's motion for summary judgment or adjudication*

In October 2010, on remand from *Jameson II*,[5] Desta filed a motion for summary judgment or summary adjudication. Desta supported his motion with the declaration of Dr. Tarek Hassanein, who stated that Desta had complied with the standard of care in his treatment of Jameson, and that Desta's acts had not caused Jameson to suffer any damages. Desta argued that he was entitled to summary adjudication of Jameson's professional negligence claim, unless Jameson could present conflicting expert evidence on these issues.

With respect to Jameson's claim for breach of fiduciary duty, Desta outlined the elements of the tort: the existence of a fiduciary duty, breach, and damage proximately caused by that breach. Desta then argued the following:

---

5    We have omitted the lengthy procedural history of this case prior to the remand from *Jameson II*, since it is not relevant to the issues in this appeal.

"Back in 2000, Dr. Desta was employed by Careview Medical Group, who was subcontracted by Alvarado Hospital to provide outpatient services to Donovan inmates. [Citations.] As seen in Special Interrogatory No. 10, [Jameson] asked what payment arrangements Dr. Desta had with Donovan. In response to this interrogatory, Dr. Desta responded that he was paid hourly as subcontracted by Alvarado Hospital through his employer, Careview Medical Group. Therefore there was no breach of fiduciary duty by Dr. Desta and he fulfilled his obligations and he never abandoned the patient. In fact Dr. Hassanein opines that Dr. Desta 'cured' [Jameson] of the [hepatitis] infection.

"Consequently, without any admissible evidence to support all three elements: the existence of a fiduciary duty between Dr. Desta [and] [Jameson]; that Dr. Desta breached said duty; and the alleged damage was proximately caused by said breach, [Jameson's] cause [of] action fails and summary adjudication of this issue should be granted."

Desta supported his motion with a declaration from Dr. Hassanein, a licensed physician who is board certified in internal medicine, gastroenterology, and transplant hepatology. In his declaration, Dr. Hassanein states, "[I]t is my professional opinion that Dr. Desta's care and treatment of Mr. Jameson was at all times completely within the standard of care in the community." Dr. Hassanein further states:

"At the time Dr. Desta assumed care, this patient had been correctly diagnosed with Hepatitis C, genotype 3. This is a favorable category of viral hepatitis, which generally has about an 80% statistical likelihood of 'cure' with treatment. The medical literature generally defines a patient with a negative lab result after six months of treatment as being 'cured' in this context.

"The treatment in this case began in March 2000 and was alpha-Interferon injections three times per week for one year. This was appropriate and within the standard of care.

"This patient had negative lab results at the end of his treatment, and again consistently through 2008. Thus he meets the generally accepted definition of a patient who has been 'cured' of this disease.

9

"[¶] . . . . [¶]

"[I]t is my further opinion, to a reasonable degree of medical probability that no act or omission on Dr. Desta's part caused or contributed to any alleged damages on the part of Barry Jameson."

Desta also supported his motion with medical records showing that Jameson's hepatitis C viral load in March 2000 was 574,660 and that by February 2001, his viral load was less than 600.

C.    *Jameson's opposition*

In his opposition to Desta's motion, Jameson began by clarifying the precise nature of his claim. Jameson explained that, after he filed the complaint in this case, he obtained documents that stated that he did in fact have a detectable hepatitis C viral count in March 2000, when he commenced treatment with Desta. However, Jameson stated that medical records demonstrated that he had no detectable viral count as of May 2000, approximately two months after he began the interferon treatment. Jameson explained that in light of this information, he was claiming that Desta's conduct in prescribing the "second six-month regimen [of interferon] was medically unjustified."

With respect to his claim of professional negligence, Jameson argued that to the extent that he was required to present expert testimony to counter the expert testimony that Desta presented in support of the summary judgment motion, Jameson was relying on Dr. Hassanein's statement in his declaration that a person with a negative lab result after six months of treatment for hepatitis C is considered cured. Jameson argued that

10

since medical records showed that he had a negative lab result for hepatitis C as of May 2000, there was no medically justifiable reason for Desta to have subjected Jameson to additional interferon injections.

With respect to Desta's argument that Jameson would be unable to establish the causation element of his professional negligence claim, Jameson argued in part as follows, "[I]gnoring the permanent eye damage and constant headaches Jameson suffers as a result, no party can dispute that injecting themselves three times a week itself causes pain and suffering."[6]  Jameson also noted that the common side effects of interferon include flu-like symptoms, depression, and other physical and mental disorders.

With respect to his claim of breach of fiduciary duty, Jameson argued that Desta had breached his duty to Jameson by subjecting Jameson to unnecessary treatment after Desta knew or should have known that Jameson was cured.  Jameson also incorporated the remainder of his brief, which including the following:

> "Jameson was told by Desta at the commencement of treatment he would be treated for six months and Desta would see how well the Alpha-2B Interferon injections worked for Jameson.  Within a month after taking the injections, Jameson had no viral count, but he was never informed of such and the documents showing such, which Jameson repeatedly requested to see from Desta and his medical

---

[6]    In his separate statement of facts, Desta stated, "No act or omission on the part of Dr. Desta caused or contributed to [Jameson's] damages."  Jameson disputed this fact and stated, "[W]ithin a few weeks of commencing his [six]-month regimen in April of 2000 of Alpha-2B Interferon, Jameson had no detectable viral count.  Therefore, with no detectable viral count for Hepatitis C and Desta's own alleged expert, Dr. Tarek I. Hassanein stating in his [declaration] that Jameson should have been deemed 'cured' if he had no detectable viral count within the [six]-month regimen, the acts by Desta subjecting Jameson to a second regimen of Interferon . . . clearly contributed to Jameson's damages."

11

team, were not being kept in Jameson's medical file.  At the six month date, Desta simply stated Jameson was doing fine and he was going to start Jameson on a second [six]-month regimen of Interferon."

Jameson filed a declaration with his opposition to the motion in which he provided support for his claims that he had not been fully informed concerning his condition, stating:

> "I was never informed of any of the [hepatitis C] viral assays before being placed on Alpha-2B Interferon and only discovered a few of them stating I did not have any [hepatitis C] viral assay in my twelfth month of injecting myself with Interferon when a nurse-aide showed me two that were in the file.

> "I spent months, while being injected with Interferon, asking all medical staff and Desta for the [hepatitis C] viral assay documents and was never allowed to see any . . . ."

With respect to pain and suffering that he allegedly endured, Jameson stated:

> "Although I suffered from 'regular' symptoms such as headaches during the initial [six]-month regimen, when I was started on another [six]-month regimen by [Desta], the pain and suffering increased dramatically and I started having severe eye pain.  At times, I even had to walk outside with my hand over my eye left eye (which was now seeing double or triple) because sunlight was so painful, pressing on my eyeball to try and relieve the pain."

Jameson also lodged medical records that indicated that his hepatitis C viral load in May 2000 was less than 2000.

D.   *The trial court's tentative ruling and Jameson's objections thereto*

After Desta filed a reply,[7] the trial court issued a tentative ruling granting the motion for summary judgment on the ground that Jameson could not "establish an element of either the professional negligence or the fiduciary duty claim: that defendant breached any legal duty to [Jameson]." The trial court further stated, "[Jameson] has failed to negate Dr. Hassanein's opinion with any admissible evidence." The court also stated, "The lab tests [Jameson] refers to in his . . . Opposition . . . raise an inference that [Desta] was successful in curing [Jameson] (not the reverse)."

Jameson filed an objection to the trial court's tentative ruling in which he argued that he was not required to designate an expert because Desta had failed to make a written demand for such a designation. In the alternative, Jameson stated that he had retained an expert and requested "the opportunity to present a declaration of his retained expert."

On January 20, 2011, the trial court held a hearing.[8] At the hearing, the court declined to adopt its tentative ruling granting the motion for summary judgment. Instead, the court granted Jameson's motion to continue the summary judgment hearing to allow Jameson to file an expert declaration from Dr. Cooper.

---

7   In his two-page reply, Desta argued that the trial court was required to grant his motion for summary judgment because Jameson had failed to controvert Dr. Hassanein's expert opinion with admissible expert testimony.

8   Jameson participated telephonically in the hearing.

13

E.    *Dr. Cooper's declaration*

On or about February 14,[9] Jameson filed the declaration of Dr. Cooper, a licensed physician and Professor of Medicine in the Division of Gastroenterology and Hepatology, Department of Medicine, Stanford School of Medicine.  In his declaration, Dr. Cooper states that in his opinion, "Desta's care and treatment of Jameson was substandard and a direct cause of the suffering and injury to Jameson and contrary to the prevailing standard of care in the medical community in 2000-2001."   Dr. Cooper explained the basis for his conclusion that Desta had acted below the standard of care in treating Jameson, as follows:

> "Jameson was given [alpha-2B interferon] commencing in 2000. [Alpha-2B interferon] . . . was known as monotherapy, as only [alpha-2B interferon] was used.  The response rate with [alpha-2B interferon] was quite poor and in 1998, [a] two-drug therapy was introduced, which consisted of interferon and ribavirin.  With this combination therapy available in 1998 it was found that six months of therapy was adequate for patients with genotype 2 or 3. Therefore, Jameson should not have been subjected to the monotherapy for one year, when combination therapy had been available for approximately two years [and] was well known in the medical community at the time of Jameson's treatment."

Dr. Cooper stated that he agreed with Dr. Hassanein that "a person can be considered 'cured' after six (6) months of treatment with Alpha-2B Interferon if they have no detectable viral count[] within this period," and that "[t]he documents of record in this matter demonstrate that [by] May of 2000 Jameson's viral count was less tha[n] . . . 2000,

---

9    The declaration in the record does not bear a file stamp. The court's order granting summary judgment states that Jameson filed Dr. Cooper's declaration on "February 14 and February 16."

14

which shows it was undetectable, and Jameson was considered cured."  Dr. Cooper also

stated that interferon was known to cause "severe mental and physical side effects,

and . . . is associated with retinal problems."

In response to Dr. Cooper's declaration, Desta filed a brief in which he took issue

with Dr. Cooper's use of the standard of care in the general medical community, and

maintained that the proper standard of care was the standard applicable in the prison

community.  Desta argued that because he had presented evidence that he had met this

latter standard, and that evidence was uncontradicted, he was entitled to summary

judgment.

F.      *The trial court's orders granting summary adjudication of Jameson's breach of
        fiduciary duty claim, permitting Desta to depose Dr. Cooper, and continuing the
        motion for summary judgment*

After a hearing on February 25,[10] the trial court entered an order in which the

court described the procedural history of the case and then stated:

> "The foregoing chronology has allowed the court to hone in on the
> central issue of the case: under treatment protocols in place during
> the relevant 2000-2001 timeframe, was it appropriate for Dr. Desta
> to continue therapy for [six] months after the plaintiff's testing
> results came back indicating he had been cured?  Interrelated with
> this question is the question of what is the relevant 'medical
> community,' the general medical community or the more limited one
> serving [the Department's] inmates?"

---

10      Jameson participated telephonically in the February 25 hearing.

The court granted Jameson's February 7 motion[11] to continue the hearing on the motion for summary judgment. The court stated that continuing the motion would provide defense counsel the opportunity to depose Dr. Cooper and would allow Desta the opportunity to brief the issue that the court had identified in the prior paragraph.

The court further ruled that "nothing [Jameson] has filed . . . raises a triable issue of fact with respect to the claim for breach of fiduciary duty." The court thus granted the motion for summary adjudication of Jameson's breach of fiduciary duty claim.

G.      *The parties' supplemental briefing on the applicable standard of care*

Jameson filed a supplemental brief in which he argued that it would be unconstitutional to apply a lower standard of care in evaluating a prisoner's professional negligence action against a health care provider.[12]

Desta filed a supplemental reply in which he argued that "the 'standard of care' is different in the prison setting," and that he had "provided the treatment that was available in the prison setting." Desta supported this supplemental reply with his own declaration in which he stated that interferon injections were the only available form of treatment for inmates suffering from hepatitis C genotype 3a under the Department's governing

---

[11]      The motion is not in the record.

[12]      Jameson also argued that Desta had breached his fiduciary duty to Jameson by failing to inform him of the combination therapy to which Dr. Cooper had referred in his declaration. However, as noted above, the trial court had previously granted Desta's motion for summary adjudication of this claim. Jameson stated in his brief that he had yet to receive the February 25 order granting Desta summary adjudication of Jameson's breach of fiduciary duty claim. Jameson also stated that he understood the February 25 order to be a tentative ruling granting summary adjudication of that claim.

16

protocols during the relevant timeframe. Desta also lodged a 1998 memorandum from the Department entitled, "Chronic Viral Hepatitis Guidelines." The 1998 memorandum discussed how clinicians should treat inmates who suffered from hepatitis, and outlined the factors that clinicians should consider in determining whether and how to prescribe interferon.

Jameson filed a response to Desta's supplemental reply in which he reiterated his argument that the standard of care in prison is not lower than the standard of care in the general population.

H.      *Dr. Cooper's deposition and related pleadings*

On March 14, Jameson filed a motion in which he requested that the court preclude Desta from deposing Dr. Cooper for various procedural reasons, including that Desta was purportedly seeking improper discovery beyond the discovery cut-off date. In the alternative, Jameson requested that the court order Desta's counsel to arrange with prison officials to permit Jameson to appear telephonically at the deposition, that the court appoint counsel for the purpose of attending the deposition, or that the deposition be conducted through written questions.

On March 30, the trial court entered an order that states in relevant part: "The court hereby orders [Jameson's] expert to sit forthwith for a deposition. [Jameson's] objection to deposition is meritless." The court did not address Jameson's requests to participate in the deposition.

On April 11, defense counsel noticed Desta's deposition.

17

On April 18, Jameson filed a motion in which he requested that the court require Desta to conduct the deposition through written questions pursuant to Code of Civil Procedures section 2028.010[13] or that the court appoint counsel for Jameson for the purpose of attending the deposition. Jameson argued that such measures were required to ensure due process because he was "presently incarcerated and unable to attend the deposition of his own expert."

On April 29, prior to the trial court ruling on Jameson's April 18 motion, defense counsel deposed Dr. Cooper. Jameson did not participate telephonically in the deposition, and was not represented by counsel.

After deposing Dr. Cooper, Desta filed a supplemental reply in support of his motion for summary judgment. In this reply, Desta contended that Dr. Cooper's deposition established that Jameson would not be able to establish the causation element of his cause of action for professional negligence. In support of this contention, Desta cited various excerpts of Dr. Cooper's deposition that Desta maintained demonstrated that Dr. Cooper would be unable to offer an expert opinion with respect to whether Desta's acts had caused Jameson to suffer any harm. One of the excerpts that Desta cited is the following:[14]

---

[13] Unless otherwise specified, all subsequent statutory references are to the Code of Civil Procedure.

[14] Desta lodged portions of Dr. Cooper's deposition in support of his supplemental reply.

"Q: There are some cases that you address both standard of care and causation?

"A: That's correct.

"Q: In this case, it was just solely limited to standard of care, as to what Dr. Desta should have done, in your mind, to comply with the standard of care?

"A: Yeah."

Desta also quoted this portion of the Dr. Cooper's deposition:

"Q: You postulated in [your declaration] that . . . alpha interferon has been known to cause severe mental and physical side effects with patients, but in this case you can't say one way or the other whether or not Mr. Jameson suffered any of those?

"A: I can't say one way or other. He has complaints.

"Q: You know from other cases that you've been on, in order to make a determination of that, not only do you have to have those records to review, but you have to determine that it's more likely than not that that therapy caused whatever problem is that the patient is complaining of, not that's a possibility, but more likely than not?

"A: Correct.

"Q: And you can't say that in this case?

"A: I can't comment either way in this case. I can't say it is or isn't more likely than not that his complaints are related to hepatitis [*sic*] because there is not enough information to conclude . . . either way."

Finally, Desta quoted the following:

"Q: You have no opinions on causation or damages in this case: true?

"A: I haven't seen enough to draw opinions."

Desta also quoted excerpts from the deposition in which Dr. Cooper stated that he had not seen evidence that Jameson had suffered retinal damage.

Jameson filed a response to Desta's supplemental reply in which he argued that the court had erred in failing to rule on his March 14 motion concerning Dr. Cooper's deposition. Jameson stated that he had informed Dr. Cooper that the deposition would not take place until after the trial court had ruled on his motion, and also stated that in light of the trial court's statements in its February 25 ruling, he had informed Dr. Cooper that Dr. Cooper "would be addressing the standard of care." Jameson argued that the procedural posture of the case had resulted in "a one-sided deposition where a doctor was led to discuss the standard of care, but was not able to understand the need to further explain causation."

Jameson maintained that, notwithstanding these procedural objections, Dr. Cooper's deposition testimony established a triable issue of fact as to causation. Jameson noted that Dr. Cooper had testified that interferon causes side effects such as "joint aches and pains, loss of appetite, weight loss, insomnia, depression," and that it causes flu-like symptoms. Jameson also argued that excerpts from his medical records established that he has suffered various side effects from the interferon that Desta had prescribed. Jameson argued that even though "on some issues [defense counsel] led Cooper to state he had not 'seen enough to draw opinions' on causation or damages[, this] could easily have been cured by Jameson being able to participate [in the deposition]." As an example, Jameson reiterated his contention that since Dr. Cooper had stated that it was his opinion that Jameson had been subjected to the "wrong therapy," it was clear that

20

Desta's conduct in having "Jameson inject himself with interferon for [six] <u>extra</u> months . . . cause[d] Jameson to suffer the plethora of adverse side effects such injections are well documented to cause and that Jameson complained of." Jameson argued that Dr. Cooper's inability to state that interferon had caused Jameson to suffer "<u>severe</u> mental and physical side effects," was not a basis for concluding that Jameson would be unable to establish that the Desta's acts had caused Jameson to suffer harm.

Jameson lodged several of his medical records as exhibits in support of his reply. One entry, dated April 13, 2000 and signed by the Department's staff physician, states, "[Jameson] is allowed to lie down and not work during the [three] days following interferon injections due to side effect [*sic*] of medication." An entry dated January 31, 2001 appears to order the drug Midrin and states "Headache X one year." This order appears to be signed by Desta. Another entry dated April 23, 2001 states that Jameson "still has monocular diplopia."[15] Finally, a May 16, 2001 medical record that appears to be signed by Desta states, "Stopped . . . Interferon X one year—got double vision . . . especially days of Interferon. . . ."

I.      *The trial court's rulings on Jameson's motions pertaining to Dr. Cooper's deposition and on Desta's motion for summary judgment*

After a hearing,[16] the trial court ruled on Jameson's motions pertaining to Dr. Cooper's deposition and on Desta's motion for summary judgment.

---

[15]     Diplopia is commonly known as "double vision."

[16]     Jameson participated in the hearing telephonically.

With respect to Jameson's March 14 and April 18 motions concerning Dr. Cooper's deposition, the trial court ruled, "The motions are denied as moot. The Cooper deposition has already taken place." The court also ruled that Jameson's motions lacked merit, insofar as Jameson was requesting that the trial court prevent the deposition from taking place. With respect to Jameson's contention that he had not been permitted to participate in Dr. Cooper's deposition, the court stated:

> "Dr. Cooper, [Jameson's] standard of care expert, was deposed on April 29. [Jameson] urges that he was denied due process by not being allowed to participate in this deposition. His arguments lack persuasive power when one recalls that his tardy designation of Dr. Cooper is what led to this motion [for summary judgment] not being prepared and ruled upon in an orderly fashion. Moreover, it bears noting that [Jameson] had assistance of counsel in locating and obtaining a declaration from Dr. Cooper; *there was nothing to stop [Jameson] from directing that counsel to appear at the deposition.*
>
> "[¶] . . . [¶]
>
> "Jameson's non-participation in the Cooper deposition is the result of two things: first, his incarceration; and second his untimely designation of Cooper in the first place. The court arguably bent the rules by allowing this tardy designation, and after nine years of litigation is not required to assist [Jameson] further. *Any complaint about not being at liberty to attend the deposition is something [Jameson] should have considered before committing whatever crime that gave rise to his incarceration.* That [Jameson] did not properly prepare Cooper to give opinions on causation − after nine years of litigation − is not properly laid at the feet of the court, defense counsel, or anyone else." (Italics added.)

On the merits of Desta's motion for summary judgment, the trial court ruled that Desta was entitled to judgment as a matter of law on Jameson's cause of action for professional negligence. In its ruling, the trial court stated that Dr. Cooper's declaration "arguably did raise a triable issue of fact regarding breach of duty as to the professional

22

negligence claim." However, the court ruled that Desta had established that Jameson would be unable to prove a required element of his claim, namely, that Desta's actions had caused Jameson harm. In reaching this conclusion, the trial court reasoned in part:

> "[Dr Hassanein] opines, based on his review of the relevant documents, that far from causing harm to [Jameson], [Desta] properly treated [Jameson], that [Jameson] was cured as the result of this treatment, and that [Desta's] treatment of [Jameson] was within the standard of care prevalent in the medical community in 2000-2001. . . . [¶] [Jameson] has failed to negate Dr. Hassanein's opinion as to cure with any admissible evidence. Plaintiff is not a physician, and his own opinions (even opinions allegedly informed by reading literature) are not admissible on causation of harm. . . . The law does not permit the court to discard the Hassanein declaration any more than it permits [Jameson] to rely on supposition and allegation to avoid summary judgment. . . . Indeed Dr. Cooper agrees with Dr. Hassanein that Dr. Desta cured plaintiff. [Citation.] There is no triable issue of material fact on causation, and it is clear [Jameson] cannot establish an essential element of his claim[]."

Since the trial court had previously granted summary adjudication of Jameson's breach of fiduciary claim, the court granted Desta's motion for summary judgment.

In June 2011, the trial court entered judgment in favor of Desta. Jameson timely appealed from the judgment.

### III.

### DISCUSSION

*The trial court erred in granting Desta's motion for summary judgment*

Jameson claims that the trial court erred in granting Desta's motion for summary judgment.

23

A.  *Governing law and standard of review*

1.  *The relevant statutory framework*

A "motion for summary judgment shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  (§ 437c, subd. (c).)  "A cause of action has no merit if . . . [¶] [o]ne or more of the elements of the cause of action cannot be separately established . . . ."  (*Id*. at subd. (o)(1).)  "A defendant . . . has met his or her burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action, even if not separately pleaded, cannot be established. . . . Once the defendant . . . has met that burden, the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to that cause of action. . . .  The plaintiff . . . may not rely upon the mere allegations . . . of its pleadings to show that a triable issue of material fact exists but, instead, shall set forth the specific facts showing that a triable issue of material fact exists as to that cause of action . . . ."  (*Id*. at subd. (p)(2).)

2.  *The trial court's determination of a defendant's summary judgment motion*

A trial court must employ a "three-step process . . . in analyzing a summary judgment motion."  (*Y.K.A. Industries, Inc. v. Redevelopment Agency of City of San Jose* (2009) 174 Cal.App.4th 339, 367.)  The trial court must first " ' " 'identify the issues framed by the pleadings since it is these allegations to which the motion must respond.' " ' "  (*Hamburg v. Wal–Mart Stores, Inc.* (2004) 116 Cal.App.4th 497, 503, citations omitted.)

24

Next, the trial court must consider whether the defendant has carried its "initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact." (*Aguilar*, *supra*, 25 Cal.4th at p. 850.) The defendant may carry this burden by demonstrating that "the plaintiff cannot establish at least one element of the cause of action." (*Id.* at p. 853.) The defendant may make such a showing by demonstrating "that the plaintiff does not possess, and cannot reasonably obtain, needed evidence." (*Id.* at p. 854.)

"If the defendant fails to meet this initial burden [of production], it is unnecessary to examine the plaintiff's opposing evidence; the motion must be denied." (*Zoran Corp. v. Chen* (2010) 185 Cal.App.4th 799, 805.) In contrast, if the defendant has carried its burden of production, the trial court considers whether the plaintiff's opposition demonstrates a triable issue of fact. (*Aguilar*, *supra*, 25 Cal.4th at p. 849.) " 'The plaintiff . . . may not rely upon the mere allegations . . .' of his 'pleadings to show that a triable issue of material fact exists but, instead,' must 'set forth the specific facts showing that a triable issue of material fact exists as to that cause of action.' [Citation.]" (*Ibid.*) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Id.* at p. 850, fn. omitted.)

"A motion for summary judgment shall be granted when 'all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' [Citation.] . . . A summary adjudication is properly granted only if a motion therefor completely disposes of a cause of action, an

25

affirmative defense, a claim for damages, or an issue of duty.  [Citation.]  Motions for summary adjudication proceed in all procedural respects as a motion for summary judgment. [Citation.]"  (*Hartline v. Kaiser Foundation Hospitals* (2005) 132 Cal.App.4th 458, 464.)

### 3. *The standard of review on appeal*

The Court of Appeal "review[s] de novo a grant of summary adjudication. [Citation.]  'In independently reviewing a motion for summary adjudication of issues, we apply the same three–step analysis used by the superior court.  "First, we identify the issues framed by the pleadings. . . . [¶] Secondly, we determine whether the moving party's showing has established facts which negate the opponent's claim and justify a judgment in movant's favor.  . . . [¶] When a . . . motion prima facie justifies a judgment, the third and final step is to determine whether the opposition demonstrates the existence of a triable, material factual issue." '  [Citation.]"  (*Rosales v. Battle* (2003) 113 Cal.App.4th 1178, 1182 (*Rosales*).)

### B. *The trial court erred in summarily adjudicating Jameson's breach of fiduciary claim*

Jameson contends that the trial court erred in granting Desta's motion for summary adjudication on his breach of fiduciary duty claim.  Jameson argues that the court erred in granting judgment as a matter of law on this claim because Desta never addressed

Jameson's lack of informed consent theory of liability in his motion for summary judgment or adjudication.[17]

      1.      *A physician's fiduciary duty to obtain his patient's informed consent to a medical procedure*

"The elements of a cause of action for breach of fiduciary duty are: (1) the existence of a fiduciary duty; (2) breach of the fiduciary duty; and (3) damage proximately caused by the breach." (*Stanley v. Richmond* (1995) 35 Cal.App.4th 1070, 1086.) "[A] physician has a fiduciary duty to disclose all information material to the patient's decision," when soliciting a patient's consent to a medical procedure. (*Moore v. Regents of University of California* (1990) 51 Cal.3d 120, 129 (*Moore*), citing, among other cases, *Cobbs v. Grant* (1972) 8 Cal.3d 229, 242.) A cause of action premised on a physician's breach of this fiduciary duty may alternatively be referred to as a claim for lack of informed consent. (See, e.g., *Moore*, *supra*, at p. 133 ["the allegations state a cause of action for breach of fiduciary duty or lack of informed consent"].)

      2.      *Application*

Employing the three-part analysis discussed above, we first identify the issues framed by Jameson's complaint. (See *Rosales*, *supra*, 113 Cal.App.4th at p. 1182.) As noted in part II.A., *ante*, in his breach of fiduciary duty claim, Jameson alleged that Desta negligently prescribed interferon to him and that:

---

17    Specifically, Jameson states in his opening brief, "[t]he failure to inform, a cause of action in itself, was never even addressed . . . in Desta's moving papers."

"Desta held a position of trust with [Jameson], causing [Jameson] to rely on Desta's statements and recommendation that [Jameson] begin treatment and stay on it. It is only through [Jameson's] research of his own medical file and hepatitis literature that even as a layman he easily discovered the mistaken or malicious prescription by Desta that resulted in such damage."

In addition, in a section of his complaint entitled "Summary of Initial Facts and Supplemental Facts," Jameson alleged that he had attempted to obtain information concerning his "viral count" during his course of interferon treatment, and that he was never provided with such information.

Although not a model of clarity, these allegations adequately pled a claim for breach of fiduciary duty based on Desta's failure to obtain Jameson's informed consent to the interferon treatment.[18]

---

[18] Desta does not contend otherwise on appeal. Further, the trial court previously overruled Desta's demurrer to Jameson's breach of fiduciary claim in which Desta maintained that the claim was uncertain and failed to state facts sufficient to constitute a cause of action. In overruling the demurrer, the court reasoned in part:

"The [first] cause of action for breach of fiduciary duty is not subject to demurrer for uncertainty. Demurrers for uncertainty are disfavored and will only be sustained where the defendant cannot reasonably determine what issues must be admitted or denied, and are appropriately overruled where the facts are ascertainable by invoking discovery procedures. [Citation.] The gist of the allegations against Dr. Desta is that he unnecessarily started [Jameson] on an Interferon regimen, which caused plaintiff to suffer eye problems. [Desta] has not cited any authority holding a medical provider cannot be liable for such conduct."

Desta does not challenge this ruling on appeal.

28

Next, we consider whether Desta established facts that negate Jameson's claim and justified judgment in Desta's favor. (See *Rosales*, *supra*, 113 Cal.App.4th at p. 1182.) Desta did not address, in any fashion, the complaint's allegations pertaining to Desta's alleged failure to obtain Jameson's informed consent to the interferon treatment regimen in his motion for summary adjudication.[19] Having failed to address Jameson's allegations pertaining to this theory of liability, Desta failed to carry his "initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact." (*Aguilar*, *supra*, 25 Cal.4th at p. 850.) In light of Desta's failure to carry his initial burden in moving for summary adjudication of Jameson's claim of breach of fiduciary duty, the trial court erred in granting judgment as a matter of law in favor of Desta on that claim. (*Zoran Corp. v. Chen*, *supra*, 185 Cal.App.4th at p. 805 ["If the defendant fails to meet this initial burden [of production], it is unnecessary to examine the plaintiff's opposing evidence; the motion must be denied."].)[20]

---

[19]    Desta's motion for summary adjudication of this claim focused exclusively on the "payment arrangements [that] [he] had with Donovan." (See pt. II.B., *ante*.)

[20]    In his respondent's brief, Desta does not address Jameson's breach of fiduciary duty claim other than to state the following:

> "Even in a claim for lack of informed consent, a plaintiff has to establish that his or her injury resulted from a risk which the plaintiff claims the defendant failed to advise of. As stated in *Cobbs v. Grant*, [*supra*, 8 Cal.3d at p. 245], 'There must be a causal relationship between the physician's failure to inform and the injury to the plaintiff. As noted above, such causal connection can only be established by a medical expert."

29

C.       *The trial court erred in summarily adjudicating Jameson's professional negligence claim*

Jameson contends that the trial court erred in granting judgment as a matter of law on his professional negligence claim.

1.       *The trial court erred in concluding that Jameson would be unable to establish the causation element of his claim*

Jameson claims that the trial court erred in concluding that Desta established that Jameson would be unable to prove a required element of his claim, namely, that Desta's actions caused Jameson harm.

a.       *Governing law*

" 'The elements of a cause of action for professional negligence are failure to use the skill and care that a reasonably careful professional operating in the field would have used in similar circumstances, which failure proximately causes damage to plaintiff.' " (*Cyr v. McGovran* (2012) 206 Cal.App.4th 645, 651, citations omitted.)  With respect to the element of proximate cause, "In a medical malpractice action, the evidence must be sufficient to allow the jury to infer that in the absence of the defendant's negligence, there was a reasonable medical probability the plaintiff would have obtained a better result." (*Alef v. Alta Bates Hospital* (1992) 5 Cal.App.4th 208, 216, citations omitted.)

---

In so arguing, Desta appears to acknowledge that Jameson alleged a claim of lack of informed consent in his complaint.  However, as noted, Desta failed to raise any argument with respect to this theory of liability in his motion for summary judgment or adjudication.

30

Generally speaking, " 'The law is well settled that in a personal injury action causation must be proven within a reasonable medical probability based upon competent expert testimony. Mere possibility alone is insufficient to establish a prima facie case. [Citations.] That there is a distinction between a reasonable medical "probability" and a medical "possibility" needs little discussion. There can be many possible "causes," indeed, an infinite number of circumstances which can produce an injury or disease. A possible cause only becomes "probable" when, in the absence of other reasonable causal explanations, it becomes more likely than not that the injury was a result of its action. This is the outer limit of inference upon which an issue may be submitted to the jury.' [Citation.]" (*Bromme v. Pavitt* (1992) 5 Cal.App.4th 1487, 1498, citations omitted.)

A plaintiff presents sufficient evidence on the element of causation to avoid summary judgment in a medical malpractice action by presenting expert testimony that a physician's breach of the standard of care caused the plaintiff to undergo an unnecessary medical procedure that was painful and inherently injurious. (*Tortorella v. Castro* (2006) 140 Cal.App.4th 1 (*Tortorella*).) In *Tortorella,* a physician performed sinus surgery on a patient. (*Id*. at p. 4.) The patient brought a medical malpractice action in which she alleged that the physician had been negligent in examining, diagnosing and treating her. (*Id*. at pp. 4-5.) The physician brought a motion for summary judgment in which he contended that he had acted within the standard of care and that he had not caused the plaintiff to suffer harm. (*Id*. at p. 5.) The physician supported his motion with an expert declaration. (*Ibid*.) In opposing the motion, the plaintiff filed the declaration of a qualified expert who stated that the defendant physician had acted below the standard of

31

care in performing an unnecessary surgery. (*Id*. at pp. 5-6.) The trial court granted the motion for summary judgment on the ground that the patient's expert's declaration had failed to raise a triable issue of fact as to causation. (*Id*. at p. 6.)

The *Tortorella* court concluded that the trial court had erred in granting the motion. (*Tortorella*, *supra*, 140 Cal.App.4th at p. 10.) The court reasoned, "Although the trial court read [plaintiff's expert] declaration as being silent with respect to the issue of causation, it seems self-evident that unnecessary surgery is injurious and causes harm to a patient. Even if a surgery is executed flawlessly, if the surgery were unnecessary, the surgery in and of itself constitutes harm." (*Id*. at p. 11.) The *Tortorella* court explained the application of its holding in the context of a motion for summary judgment:

> "[A]ny unnecessary surgery is inherently injurious in that the patient needlessly has gone under the knife and has been subjected to pain and suffering.
>
> "Therefore, at the summary judgment stage, if the opposing papers raise a triable issue as to whether a physician deviated from the standard of care by unnecessarily performing surgery, that is sufficient also to raise triable issues with respect to the two remaining elements of a cause of action for medical malpractice, namely, ' " '(3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence.' " ' [Citation.]
>
> "Thus, [plaintiff's] expert declaration to the effect that the . . . surgery was . . . unnecessary, was sufficient to raise a triable issue of material fact not only as to whether the performing of said surgery was a deviation from the standard of care, but also as to the presence of a causal connection between the negligent conduct and injury to the patient." (*Id*. at p. 13, fn. omitted.)

32

b.     *Application*

We begin our analysis by identifying the issues framed by Jameson's complaint. (See *Rosales*, *supra*, 113 Cal.App.4th at p. 1182.)  As noted in part II.A., *ante*, in his professional negligence claim, Jameson alleged that Desta negligently treated him for hepatitis by prescribing a course of interferon treatment "that [Jameson] did not need," and that caused him to suffer severe side effects including "migraine headaches, vision loss, weight loss, depression and severe emotional duress."

Desta carried his "initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact" (*Aguilar*, *supra*, 25 Cal.4th at p. 850) by supporting his motion with the declaration of a medical expert, Dr. Hassanein, who stated that Desta had acted within the standard of care by prescribing "alpha-Interferon injections three times per week for one year" and that Desta had not caused Jameson to suffer any damages.

In opposition, with the filing of Dr. Cooper's declaration, Jameson raised a triable issue of fact with respect to both the standard of care and causation.  In his declaration, Dr. Cooper stated that Jameson should have been given a *six-month* regimen of combination therapy (interferon and ribavirin), rather than a *year* of interferon injections. Based on Dr. Cooper's declaration, a jury could reasonably find that Jameson was subjected to six months of unnecessary alpha-interferon injections.  Even without expert

33

testimony that the injections caused Jameson to suffer any harm,[21] it cannot be disputed that injections are "inherently injurious in that the patient needlessly has . . . been subjected to pain and suffering." (*Tortorella*, *supra*, 140 Cal.App.4th at p. 13.)[22] Thus, as in *Tortorella*, Jameson presented expert testimony that a physician's breach of the standard of care caused him to undergo an unnecessary medical procedure that was painful and unnecessary. (*Ibid.*) Under these circumstances, Jameson "raise[d] a triable issue of material fact not only as to whether [prescribing the unnecessary injections was] a deviation from the standard of care, but also as to the presence of a causal connection between the negligent conduct and injury . . . ." (*Ibid.*)

The trial court's conclusion that Jameson failed to raise a triable issue of fact as to causation because he "failed to negate Dr. Hassanein's opinion as to *cure* with any admissible evidence" (italics added), is erroneous because Jameson's professional negligence claim is not premised on the allegation that Desta *failed to cure* him of hepatitis. Rather, it is clear from Jameson's complaint that his professional negligence claim is based on his contention that Desta subjected him to *unnecessary* treatment. Jameson alleged in his complaint that Desta prescribed a course of treatment "that

_____

21    We consider below whether Desta established that Jameson will be unable to prove, with expert testimony, that the interferon injections caused Jameson to suffer injuries beyond those inherent in the injections themselves.

22    In his opposition to the motion for summary judgment, Jameson argued that, "no party can dispute that injecting themselves three times a week itself causes pain and suffering." Desta presented no evidence that Jameson was subjected to injections that did not cause pain or suffering. Nor has Desta cited any case law that suggests that the pain of being repeatedly injected over a six-month period does not constitute a compensable tort damage.

[Jameson] did not need," and repeatedly emphasized this point in opposing the motion for summary judgment. For example, in his objection to the court's tentative ruling granting Desta's motion, Jameson argued:

> "The court found that Jameson was 'cured,' therefore any further abuse alleged by Jameson after he was cured is irrelevant. It appears, at least to Jameson, that no reasonable juror that was treated and cured of a serious disease would allow any doctor to spend another [six] months injecting the juror with poison and suffering unnecessarily. That is what has occurred."[23]

We also reject Desta's contention that we may affirm the judgment on the ground that various excerpts (see pt. II.H., *ante*) from Dr. Cooper's deposition that Desta lodged in support of his motion establish that Jameson will be unable to establish the causation element of his claim.[24] To begin with, there is nothing in these excerpts that undermines our conclusion that Dr. Cooper's declaration creates a triable issue of fact with respect to whether Desta subjected Jameson to an unnecessary and painful regimen of injections that were themselves inherently injurious, and constituted a type of legally compensable damage. Thus, even assuming that Desta is correct in his assertion that Dr. Cooper had no opinion with respect to whether the interferon caused Jameson to suffer injures *beyond*

---

[23]    In his brief on appeal, Desta acknowledges that Jameson's claim is that "[Jameson] suffered side effects from the medication."

[24]    After the trial court granted Desta's motion for summary judgment, Jameson filed a request to augment the record to include the entire transcript of Dr. Cooper's deposition. The record does not indicate whether the trial court ruled on Jameson's request. On appeal, Jameson filed an opposed motion to augment the record to include the transcript of the entire deposition. In light of our reversal of the summary judgment based on the record that was before the trial court at the time of its ruling, we deny Jameson's request to augment the record as moot.

35

those inherent in the injections, Desta would not be entitled to summary adjudication of Jameson's claim.  (See *DeCastro West Chodorow & Burns, Inc. v. Superior Court* (1996) 47 Cal.App.4th 410, 422  ["[S]ection 437c, subdivision (f)(1), does not permit summary adjudication of a single item of compensatory damage which does not dispose of an entire cause of action."].)

Further, while we acknowledge that the statements that Desta cites from Dr. Cooper's deposition concerning causation are ambiguous, we disagree that these statements conclusively establish that Jameson will be unable to establish that the interferon injections caused him to suffer various injurious side effects.

For example, while Dr. Cooper stated that he had not "seen enough to draw opinions," about "causation or damages," other excerpts from the deposition that Desta offered in support of the motion for summary judgment are less than conclusive on this issue.  Most notably, defense counsel directly asked Dr. Cooper whether Jameson "experience[d] any physical problems that you attribute to the alpha interferon itself?" Dr. Cooper replied, "I think that there's notes that he had the usual side effects of interferon, which are joint aches and pains, loss of appetite, weight loss, insomnia, depression, et[] cetera.  So I think that was ongoing."  Dr. Cooper also stated, "Interferon gives you the flu. . . .  [W]hen you get the flu, you release a lot of interferon . . . you feel like shit.  It's true.  And that's the interferon in your body.  We just give you ten times as much interferon as your body would."

Given that Dr. Cooper unambiguously stated in his declaration, "It is my opinion that [Desta's] care and treatment of Jameson was substandard and a direct cause of the suffering and injury to Jameson and contrary to the prevailing standard of care in the medical community in 2000-2001," we cannot say that the deposition excerpts on which Desta relies conclusively established that Dr. Cooper had no opinion with respect to whether the interferon caused Jameson to suffer physical injuries attributable to the medication.[25]

Accordingly, we conclude that the trial court erred in granting summary adjudication of Jameson's professional negligence claim on the ground that Jameson would be unable to establish the causation element of his claim.

2. *This court cannot affirm the trial court's summary adjudication of Jameson's professional negligence claim on the ground that there is no triable issue of fact with respect to whether Desta breached the standard of care*

Desta contends this court may affirm the trial court's order granting judgment as a matter of law on Jameson's professional negligence claim on the ground that Jameson failed to raise a triable issue of fact with respect to whether Desta breached the standard

---

[25] In light of our conclusion, we need not consider Jameson's contention that this court should reverse the trial court's summary adjudication of this claim on the ground that he raised a triable issue of fact with respect to the causation element of his claim by virtue of the doctrine of res ipsa loquitur. (See generally *Bardessono v. Michels* (1970) 3 Cal.3d 780, 790 ["In cases in which the physician or surgeon has injected a substance into the body, the courts have followed the test that if the routine medical procedure is relatively commonplace and simple, rather than special, unusual and complex, the jury may properly rely upon its common knowledge in determining whether the accident is of a kind that would ordinarily not have occurred in the absence of someone's negligence."].)

of care. Specifically, Desta contends that "the 'standard of care' is different in the prison setting," and that Dr. Cooper's declaration did not raise a triable issue of fact with respect to whether Desta met this "different" standard of care. Desta reasons that "Dr. Cooper's opinion has no value," because "although combination therapy was available to the general public, it was not available to the prison population where the plaintiff was incarcerated."

a.   *Governing law*

" 'The standard of care in a medical malpractice case requires that medical service providers exercise that . . . degree of skill, knowledge and care ordinarily possessed and exercised by members of their profession under similar circumstances. The standard of care against which the acts of a medical practitioner are to be measured is a matter peculiarly within the knowledge of experts; it presents the basic issue in a malpractice action . . . .' [Citation.]" (*Barris v. County of Los Angeles* (1999) 20 Cal.4th 101, 108, fn. 1; see also *Avivi v. Centro Medico Urgente Medical Center* (2008) 159 Cal.App.4th 463, 470 (*Avivi*) ["the standard of care for physicians is the reasonable degree of skill, knowledge and care ordinarily possessed and exercised by members of the medical profession *under similar circumstances*"].)

b.   *Factual and procedural background*

As described in detail in parts II.E.F.G., *ante*, Dr. Cooper stated in his declaration that Desta had deviated from the "prevailing standard of care in the medical community" because "Jameson should not have been subjected to the monotherapy for one year, when combination therapy had been available for approximately two years [and] was well

38

known in the medical community at the time of Jameson's treatment."[26]  Dr. Cooper

explained that if Desta had adhered to the standard of care and used combination therapy,

Jameson would have received a total of six months of treatment rather than a year of

treatment.

In response, Desta argued that "the standard of care is different in the prison

setting," and offered a declaration in which he stated that " 'monotherapy' treatment was

the only medical therapy available that was through the protocol that was approved by the

[Department] and in effect as of  May 27, 1998."  Desta lodged the 1998 protocol that he

referred to in his declaration.  The protocol outlines the manner by which clinicians

should treat inmates with hepatitis, including a description of whether and how to

prescribe interferon.

c.    *Application*

At the outset, we consider Desta's suggestion Dr. Cooper's declaration does not

raise a triable issue of fact with respect to whether Desta breached the applicable standard

of care because the 1998 protocol establishes that a lower standard of care applied in the

prison setting.  Although the 1998 protocol provides recommendations for health care

professionals who provide medical care in California prisons, the protocol expressly

states, "These guidelines are intended to assist the practitioner, but as always, guidelines

---

[26]    Dr. Cooper stated in his declaration that he was "extremely familiar with the
standard of care in the discipline of hepatology and the standard of care as it existed
during the period of treatment of [Jameson] in this case from 2000-2001."

39

are not a substitute for exercising good clinical skill and judgment."  Further, the 1998 protocol states:

> "Choosing treatment options for patients with chronic viral hepatitis requires medical judgment since information gained from the studies do not correlate well with histopathology.  In addition, this field of medical practice is new and is rapidly changing as new techniques and therapies are developed.  They will continue to be periodically updated, consistent with the principles of medical practice."

The language of the protocol suggests that rather than establishing a treatment regimen that is binding on health care professionals in the prison setting, the protocol actually provides nonbinding "guidelines" for practitioners.  In any event, even assuming that the 1998 protocol did purport to establish a "standard of care" for doctors who provide care for California prison inmates, we reject the argument that the existence of such a protocol would demonstrate that Dr. Cooper's declaration failed to raise a triable issue of fact with respect to whether Desta breached the applicable standard of care.

Desta's argument that Dr. Cooper's "opinion has no value" and fails to raise a triable issue of material fact is premised on Desta's contention that federal courts have applied California law in concluding that the "standard of care is different in the prison setting."[27]  In support of this contention, Desta cites two cases, neither of which remotely support his argument that doctors who provide medical care in California's prisons are held to to a lower standard of care than those who provide medical treatment in the general medical community.  Desta first cites a dissenting opinion in *Wood v.*

---

[27]    Specifically, after discussing *Avivi*, Desta argues, "Based on this California law, the federal courts, which frequently deal with prisoner litigants, have recognized that the standard of care is different in the prison setting."

*Housewright* (9th Cir. 1990) 900 F.2d 1332, 1338 (Reinhardt, J. dissenting in part) (*Wood*), in which Judge Reinhardt concluded that Nevada prison officials' confiscation of an inmate's arm sling constituted a cruel and unusual punishment and therefore *violated* the Eighth Amendment to the United States Constitution because it constituted deliberate indifference to the inmate's medical needs. (*Id*. at p. 1336.) Judge Reinhardt reasoned in part, "*While the crowded conditions and limited resources in most prisons unfortunately result in a standard of care somewhat lower than that which prevails in society at large*, it usually requires neither sophisticated facilities nor additional resources to allow a prisoner to continue with a course of treatment he is already receiving." (*Id*. at p. 1338, italics added.) Desta contends that the italicized portion of the prior sentence supports his contention that the standard of care under California law is "different" in the prison setting. However, when read in context, it is clear that Judge Reinhardt was *lamenting* the quality of the medical treatment that prisoners often receive, and was not stating that a lower standard applies as a matter of law. More fundamentally, Judge Reinhardt was not discussing either California law (see *id*. at pp. 1337-1338 [considering whether Nevada prison officials violated the federal constitution]) or the tort of professional negligence (see *id*. at p. 1337 ["Professional negligence has nothing to do with this claim."]).

Desta also cites *Hallett v. Morgan* (9th Cir. 2002) 296 F.3d 732, 745 (*Hallet*), in which the Ninth Circuit affirmed a district court's factual finding that a Washington prison's dental services did not constitute cruel and unusual punishment under the Eighth Amendment. In the course of its analysis, the Ninth Circuit stated, "[T]he [district] court opined that dental services at the prison were acceptable even under the usual standard of

41

care in nonprison settings." (*Hallet*, *supra*, at p. 745.)  It is clear from the *Hallet* opinion that the district court was indicating that because the prison's provision of dental services did not constitute medical malpractice, they necessarily did not violate the Eighth Amendment.  (*Hallett*, *supra*, at p. 744 ["Mere medical malpractice does not constitute cruel and unusual punishment."].)  Neither the *Hallet* court, nor the district court in that case, suggested that there is a different standard of care applicable to medical malpractice actions that arise out of the care of prisoners.  Moreover, as with the dissent in *Wood*, the *Hallet* court was not discussing California law or the tort of professional negligence. (*Hallet*, *supra*, at p. 745.)  To put it charitably, neither of Desta's cases supports the proposition that medical practitioners who treat California inmates are held to a lower standard of care than that applicable to medical practitioners outside the prison context, and our independent research has not uncovered any California case law that supports this proposition.

In fact, the California authority that is most relevant to the question of the applicable standard of care in the prison setting is to the contrary.  In *Nelson v. State of California* (1982) 139 Cal.App.3d 72, in the course of distinguishing the tort of medical malpractice from the tort of failing to summon medical care under Government Code section 845.6, the Court of Appeal stated, "Once a practitioner has been summoned to examine and treat a prisoner, he or she is under a duty to exercise that degree of diligence, care, and skill such *as is ordinarily possessed by other members of the profession*.  Failure to do so is malpractice." (*Nelson*, *supra*, at p. 81, italics added; see also *Castaneda v. Department of Corrections and Rehabilitation* (2013) 212 Cal.App.4th

42

1051, 1071; *Watson v. State of California* (1993) 21 Cal.App.4th 836, 845 [both quoting

*Nelson*]; accord 2 Coates, et al., Cal. Government Tort Liability Practice (Cont.Ed.Bar

4th ed. 2006, 2012 update) Liabilities and Immunities in Specific Functional Areas,

§ 11.16, p. 737. ["A public entity has a duty to summon medical care . . . but not to make

sure that the medical care meets professional standards of reasonableness. The plaintiff's

remedy for inadequate care is an action against the appropriate state employees for

medical malpractice."].)[28]

Accordingly, we conclude that we cannot affirm the trial court's summary

adjudication of Jameson's professional negligence claim on the ground that Dr. Cooper's

declaration failed to raise a triable issue of fact with respect to whether Desta breached

the applicable standard of care.[29]

---

[28] Numerous courts in other jurisdictions have held that the standard of care applicable to physicians treating prisoners is the same as the standard that applies to the general medical community. (See, e.g., *District of Columbia v. Mitchell* (D.C. 1987) 533 A.2d 629, 648 [collecting cases and holding "physicians owe the same standard of care to prisoners as physicians owe to private patients generally"]; *Moss v. Miller* (1993) 625 N.E.2d 1044, 1051 ["those practicing the medical arts in the penitentiary are held to the same standard of care as those practicing in the communities of our State. To hold otherwise would be to abandon reason and common sense"].)

[29] Jameson suggests that the record establishes a triable issue of fact with respect to whether Desta breached the standard of care, even if Dr. Cooper's declaration were disregarded in its entirety. Jameson notes that Dr. Hassanein stated in his declaration that "[t]he medical literature generally defines a patient with a negative lab result after six months of treatment as being 'cured' in this context" and contends that other evidence in the record demonstrates that Desta unnecessarily treated Jameson with interferon after he had been cured. We need not consider this contention in light of our conclusion that Dr. Cooper's declaration constitutes evidence demonstrating a triable issue of fact as to whether Desta breached the standard of care.

43

D.	*The trial court erred in failing to ensure that Jameson would be afforded the opportunity to participate in Dr. Cooper's deposition*

In its order granting summary judgment, the trial court expressly recognized its obligation to " 'ensure indigent prisoner litigants are afforded meaningful access to the courts. . . .' " (*Jameson II*, *supra*, 179 Cal.App.4th at p. 675, quoting *Apollo v. Gyaami*, *supra*, 167 Cal.App.4th at p. 1483.)  The court also stated that it had paid "careful adherence" to this court's mandate with respect to this issue as stated in *Jameson II*.[30]

Notwithstanding these statements, the record indicates that the trial court failed to carry out this obligation in at least one respect.  More than a month and a half in advance of defense counsel's taking Dr. Cooper's deposition, Jameson filed a motion in which he requested that "Desta's counsel . . . arrange with prison officials to allow Jameson to appear at the deposition telephonically."  The trial court failed to rule on Jameson's request prior to the taking of the deposition.  As a result, defense counsel was permitted to depose Jameson's key expert witness without Jameson being afforded the opportunity to participate in the taking of the deposition.  The trial court thereafter based its (erroneous) grant of summary adjudication of Jameson's professional negligence claim *entirely* on statements that Dr. Cooper made at the deposition.  Finally, in its order granting summary judgment, the trial court ruled that Jameson's request to appear telephonically at the deposition was "moot" because "the Cooper deposition has already taken place."

---

[30]	On remand from *Jameson II*, Jameson filed a preemptory challenge to the prior trial judge pursuant to section 170.6, and the matter was reassigned to a new trial judge.

44

Proceeding in this manner is not consistent with fundamental fairness. While "a trial court is to exercise its 'sound discretion,' in determining the appropriate method by which to ensure meaningful access to the court" (*Jameson II*, *supra*, 179 Cal.App.4th at p. 678), a trial court's failure to exercise *any* discretion to ensure such access constitutes error. (See, e.g., *Rezek v. Superior Court* (2012) 206 Cal.App.4th 633, 642 ["abuse of discretion present when 'court failed to exercise discretion vested in it by law' "].) The trial court erred in failing to rule on Jameson's requests that he be allowed to participate in the deposition in some fashion prior to the taking of the deposition.

On the merits of Jameson's motion, the trial court abused its discretion in failing to direct defense counsel to ensure that Jameson be permitted to participate in some manner in the deposition. (See *Jameson II*, *supra*, 179 Cal.App.4th at p. 678 [trial court lacks discretion to refuse to ensure prisoner litigant's ability to meaningfully participate in court proceedings where access is impeded by incarceration].) We are aware that "in propria persona litigants, like appellant, are entitled to the same, but no greater, rights than represented litigants." (*Id*. at p. 684.) In seeking to be able to participate in the deposition by telephone, Jameson was not asking to be accorded any special rights. Section 2025.310 provides in relevant part, "[A]ny person other than the deponent may attend . . . a deposition by telephone or other remote electronic means." (See also Cal. Rules of Court, rule 3.1010.) The trial court abused its discretion in failing to ensure that Jameson's incarceration did not impede his ability to exercise such right.

45

Further, while the trial court rejected Jameson's contention that the court had denied him due process by failing to ensure his participation in Dr. Cooper's deposition, none of the reasons that the court offered as the bases for its conclusion is persuasive. The court noted that Jameson had failed to timely designate Dr. Cooper as an expert. Yet, the trial court permitted Jameson to file Dr. Cooper's declaration. Having granted this permission, the court could not, consistent with fundamental fairness, proceed to penalize Jameson for the late filing by allowing Desta to take Dr. Cooper's deposition without Jameson's participation. This is particularly true since the record is clear that the timing of Jameson's designation of Dr. Cooper as an expert did not impede the trial court from ruling on Jameson's request to be permitted to participate in Dr. Cooper's deposition.[31]

The trial court also stated that Jameson could have obtained his own counsel to attend the deposition and commented that "[a]ny complaint [that Jameson has] about not being at liberty to attend the deposition is something [Jameson] should have considered before committing whatever crime that gave rise to his incarceration." The case law is clear that an indigent incarcerated litigant has a right to prosecute a bona fide civil action on his own behalf and to be afforded meaningful access to the courts in doing so, and that the trial courts are to ensure that this right is protected. The trial court's statement that

---

[31]     As described in greater detail in part II., *ante*, in January 2011, the trial court continued the motion for summary judgment to permit Jameson to file Dr. Cooper's declaration. Jameson filed Dr. Cooper's declaration in February 2011. Jameson filed his request to participate telephonically in Dr. Cooper's deposition in mid-March 2011, approximately a month and a half before Desta deposed Dr. Cooper in late April 2011.

Jameson could have obtained counsel to attend the deposition, and the court's remark about Jameson's incarcerated status are entirely inconsistent with this mandate. On remand, the trial court is again directed to ensure that Jameson's right to prosecute this action is protected.

IV.

DISPOSITION

The trial court's February 25 order granting summary adjudication of Jameson's breach of fiduciary duty claim and the trial court's May 31 order granting summary judgment on Jameson's professional negligence claim are reversed. The trial court's June 17 judgment is reversed. The trial court's May 31 order denying Jameson's motion to exclude evidence of his prior felony conviction is affirmed. In the interests of justice, Jameson is entitled to recover costs on appeal.


AARON, J.

WE CONCUR:

NARES, Acting P. J.

IRION, J.

47